UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

GREGORY KELLY,                                )
                                              )
                                              )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )
                                              )          Civil Action No.: _____
                                              )          **DEMAND FOR JURY TRIAL**
RIVERSIDE PARNTERS, LLC, a Massachusetts      )
Corporation, and STEVEN KAPLAN,               )
individually.                                 )
                                              )
                                              )
            Defendants.                       )
_____)

## COMPLAINT

Plaintiff Gregory Kelly ("Plaintiff" or "Mr. Kelly"), by and through his undersigned

counsel, and for his Complaint against Defendants Riverside Partners, LLC ("Riverside") and

Steven Kaplan ("Mr. Kaplan") (collectively, the "Defendants") alleges:

## INTRODUCTION

1.      This is an action to redress Mr. Kelly's claims against Riverside and Mr. Kaplan

for: (i) breach of contract against Riverside; (ii) fraud against Riverside and Mr. Kaplan; (iii)

quantum meruit against Riverside; (iv) promissory estoppel against Riverside; (v) unfair or

deceptive acts or practices against Riverside; (vi) aiding and abetting fraud against Mr. Kaplan;

and (vii) civil conspiracy by concerted action against Mr. Kaplan.

2.      After Riverside and Mr. Kelly entered into a contract in early 2013 whereby Mr.

Kelly performed services to support Riverside's new acquisition in exchange for a $1 million

signing bonus, Riverside delayed payment to Mr. Kelly for over a year although Mr. Kelly performed all of these obligations within a few months.  Upon information and belief, Riverside made baseless and pretextual delays because it never intended to pay Mr. Kelly for his services and induced him to enter and perform the contract so it could benefit at the expense of Mr. Kelly's time and effort.  Because Riverside is denying even the existence of a contract, Mr. Kelly is left with no choice but to file suit.

3.   Mr. Kelly was the founder and President of TelJet Longhaul, LLC ("TelJet"), which provided telecommunications services and a fiber optic communications network.  Mr. Kelly owned approximately 36% of TelJet through an intermediate holding entity.

4.   When the equity holders of TelJet agreed to sell the company in late 2011, an investment bank found two potential buyers.  One potential buyer was Defendant Riverside.

5.   Defendant Steven Kaplan, a General Partner of Riverside, solicited Mr. Kelly about a potential contract between Mr. Kelly and Riverside.  On February 25, 2013, Mr. Kaplan, Ian Blasco (another General Partner of Riverside) ("Mr. Blasco"), and Mr. Kelly met in the lobby of the Boston Marriot Newton hotel to discuss the potential arrangement.

6.   Mr. Kaplan and Mr. Blasco offered Mr. Kelly a $1 million signing bonus in exchange for Mr. Kelly (i) recommending that TelJet accept Riverside's offer, (ii) using his contacts in the fiber optic network community to help Riverside optimize sales, and (iii) assisting with the transition to new ownership for TelJet.

7.   At the meeting on February 25, 2013, Mr. Kelly accepted the offer.

8.   After disclosing his signing bonus arrangement to the other equity holders of TelJet, Mr. Kelly recommended that they accept the offer from Riverside, which they did, and the sale of TelJet to Riverside was finalized on June 30, 2013.

9.      After February 25, 2013, and before August 20, 2014, Mr. Kaplan and other representatives repeatedly acknowledged – and delayed – Riverside's payment owed to Mr. Kelly after Mr. Kelly fully performed all of his contractual obligations.

10.      During an August 20, 2014, meeting with Mr. Kelly, Mr. Kaplan, and Mr. Blasco, Mr. Kaplan offered Mr. Kelly $50,000.00 and 50,000 shares of Tech Valley Communications ("TVC") (an entity owned by Riverside) instead of paying the $1 million signing bonus.  Mr. Kelly rejected this offer as his contract with Riverside was previously agreed to.  Mr. Kaplan then offered him $100,000.00 and 50,000 shares of TVC, which Mr. Kelly again rejected.

11.      After subsequent demands for the $1 million signing bonus without payment, Mr. Kelly is now filing suit.

12.      Accordingly, Mr. Kelly brings this action against Defendants for: (i) breach of contract; (ii) fraud; (iii) quantum meruit; (iv) promissory estoppel; (v) violations of M.G.L. ch. 93A for unfair or deceptive acts or practices; (vi) aiding and abetting fraud; and (vii) civil conspiracy by concerted action.

## THE PARTIES

13.      Plaintiff Gregory Kelly resides at 465 Davis Road, Monkton, Vermont 05469.

14.      Defendant Riverside Partners, LLC is a Massachusetts limited liability company, with a principal place of business at 699 Boylston Street, #800, Boston, Massachusetts 02116.

15.      Upon information and belief, Defendant Steven Kaplan resides at 50 Stonecrest Drive, Needham, Massachusetts 02492.

## JURISDICTION AND VENUE

16.    Plaintiff brings his complaint under federal diversity jurisdiction, 28 U.S.C. §
1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds
$75,000.00.

17.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this
is the district and division where a substantial part of the events or omissions giving rise to the
claims occurred.

18.    Mr. Kaplan resides in Needham, Massachusetts, and Riverside has a place of
business at 699 Boylston Street, #800, Boston, Massachusetts, and transacts business within the
Commonwealth of Massachusetts.  The events described herein took place in Massachusetts.

## FACTUAL ALLEGATIONS

### TelJet Longhaul, LLC

19.    TelJet Longhaul, LLC ("TelJet") was a Vermont limited liability company
incorporated in 2005.  It built, managed, leased, and maintained a fiber optic communications
network and offered telecommunications services, custom solutions for Internet service, point-to-
point circuits, and leasing of dark fiber.  TelJet was based in Vermont and offered services in
Vermont, New York, and New Hampshire.

20.    Mr. Kelly was the founder and President of TelJet.

21.    Mr. Kelly owned approximately 36% of TelJet through a separate, fully
transparent, intermediate holding entity.

22.    Mr. Kelly was the only equity holder who was a full-time employee of TelJet.

23.    In or around late 2011, the principals of TelJet retained an investment bank, MVP
Capital, formerly known as Media Venture Partners, to solicit potential purchasers for TelJet.

24.     TelJet had substantial debt, including trade and infrastructure debt, which led to the decision to sell the company.

25.     Some of the equity holders of TelJet were also creditors of the company. Therefore, in order for them to be paid for their contributions to the company, the sale proceeds would have had to have exceeded the debt owed by TelJet.

26.     MVP Capital found two potential purchasers of TelJet – one of which was TVC, which is an independently operated entity funded and owned by Defendant Riverside.

27.     Like TelJet, TVC also operates a fiber optic communications network and is also a telecommunications service provider operating in Upstate New York and Northern New England.

28.     Riverside is a "Boston-based private equity firm that invests in growing middle market healthcare and technology oriented companies, providing owners with liquidity and helping companies accelerate their growth."

29.     TelJet had done business with both prospective purchasers over the years, and both had made substantially similar offers to purchase TelJet for $7 million.

30.     Neither offer provided enough money to pay the equity holders of TelJet for their share of equity in the company.  However, some would receive payment as creditors.  Mr. Kelly expected to receive approximately $400,000.00 from the sale of TelJet, in a conventional transaction as proposed initially by the contestant prospective purchasers.

**Mr. Kelly's Contract with Riverside**

31.     While Riverside was trying to persuade TelJet to select its offer over the other offer, on or around January 15, 2013, Mr. Kelly was contacted by Kevin O'Connor ("Mr. O'Connor"), the Chief Executive Officer ("CEO") of TVC.

32.     Mr. O'Connor told Mr. Kelly that he was calling at the behest of Defendant Steven Kaplan ("Mr. Kaplan"), a General Partner of Riverside.

33.     TVC is an independent entity, funded and owned by Riverside, operating in a similar business to TelJet.

34.     Mr. O'Connor stated that if TelJet chose Riverside to be its purchaser, Riverside would hire Mr. Kelly to keep working for it after the sale for a significant signing bonus, although the exact amount was not yet agreed upon.

35.     Mr. Kelly agreed to speak and meet with Mr. Kaplan to work out this arrangement and discuss why Riverside's offer should be accepted by TelJet.

36.     In anticipation of receiving the significant signing bonus, on or around January 17, 2013, Mr. Kelly met with Kirk Shamberger and Kerry McManus ("Mr. McManus"), his financial advisors, of CK Financial Resources to discuss how to structure the potential deal with Riverside to pay the lowest amount of taxes.

37.     That same day, Mr. McManus set up an appointment with Jon Eggleston ("Mr. Eggleston") from the law firm Primmer Piper Eggleston & Cramer PC.  Mr. Eggleston suggested that Mr. Kelly use a "Rabbi Trust" for the potential signing bonus from Riverside.  A Rabbi Trust, codified under I.R.C. § 83, would have allowed for the deferment of the signing bonus so that it would not have been immediately subject to inclusion in Mr. Kelly's gross income.

38.     On or around January 23, 2013, Mr. Kelly met with Margaret Munro ("Ms. Munro"), his tax consultant, of Tax Panacea.  He told her about the significant signing bonus that he expected to receive from Riverside and that Mr. Eggleston suggested using a Rabbi Trust for tax purposes.  After she researched Rabbi Trusts, Ms. Munro indicated that it seemed a Rabbi Trust was appropriate for Mr. Kelly's circumstances.

39.     On or around February 8, 2013, Mr. Kelly spoke to Mr. Kaplan, who stated that Riverside wanted Mr. Kelly to continue working after the sale because he built the company and should benefit from its sale.  Mr. Kelly said that he had spoken to his financial advisors, a tax attorney, and his tax consultant, and, upon their advice, wanted to use a Rabbi Trust to receive compensation.  Mr. Kaplan indicated that he did not know what a Rabbi Trust was, but he would have Riverside's attorneys determine whether it could be used.  By the end of the conversation, Mr. Kelly and Mr. Kaplan agreed to meet in person to discuss the deal.

40.     On February 25, 2013, Mr. Kelly met Mr. Kaplan and Mr. Blasco, another General Partner of Riverside, on behalf of Riverside, in the lobby of the Boston Marriott Newton hotel, located at 2345 Commonwealth Avenue, Newton, Massachusetts 02466.

41.     Mr. Kaplan offered Mr. Kelly a $1 million signing bonus to vote in favor of Riverside in the transaction process and to work for Riverside after the sale.  In exchange for the $1 million signing bonus, TelJet would have to accept Riverside's bid of no more than $7 million, Mr. Kelly would use his contacts in the fiber optic communications network industry to help optimize sales, Mr. Kelly would assist with the transition of TelJet to new ownership to smooth the change with employees, and Mr. Kelly, in general, would do what he could to assure the smooth acquisition of TelJet.

42.     Although there was no specified payment date or term, it was clear from the conversation that Riverside intended to pay the $1 million signing bonus soon after (within several weeks of) the acquisition of TelJet.

43.     Without the $1 million signing bonus, Mr. Kelly would not have worked with Riverside as requested or worked to persuade others to favor Riverside.

44.     At this meeting, Mr. Kelly accepted Riverside's offer.

45.     Mr. Kaplan and Mr. Blasco said that they would not put the offer in writing and that it was not necessary because they were men of their word and would honor the verbal agreement.

46.     Mr. Kelly, Mr. Kaplan, and Mr. Blasco shook hands on the finalized deal.

47.     Immediately following the meeting with Mr. Kaplan and Mr. Blasco, Mr. Kelly called Mr. O'Connor to inform him that he accepted the contract for the $1 million signing bonus.  Mr. O'Connor congratulated Mr. Kelly and said that he looked forward to working with him in the future.

**Sale of TelJet**

48.     When the agreement between Mr. Kelly and Riverside was reached on February 25, 2013, Riverside and Mr. Kelly agreed that Mr. Kelly would recommend to TelJet's equity holders that TelJet formally and bindingly accept the offer by Riverside.

49.     Mr. Kelly disclosed to all of the equity holders deciding on the sale of TelJet that Riverside was giving him a significant signing bonus in exchange for his recommendation and continued work with the company.

50.     Because Mr. Kelly expected to receive the $1 million signing bonus, he relinquished any share of the proceeds from the TelJet sale for his equity and debt stakes so that his fellow equity holders could benefit more.  The equity holders not only knew that Mr. Kelly would be receiving the signing bonus, but they also knew that he was relinquishing his right to the proceeds from the sale, including recoupment of substantial loans and advances that he had made to TelJet.

51.     On March 27, 2013, with the approval of TelJet's equity holders, the agreement to sell TelJet's assets to Riverside was signed.

52.     With the sale of TelJet to Riverside, Mr. Kelly knowingly relinquished any claims he had to payments of his equity and debt stakes in TelJet to allow for his partners to receive a larger share of the proceeds.

53.     On June 30, 2013, the agreement between TelJet and Riverside was finalized, and the assets from TelJet were merged with TVC, which is an independently operating, similar company to TelJet owned by Riverside.

**Riverside's Confirmations of the Contract with Mr. Kelly**

54.     On April 25, 2013, Mr. Kelly met with Mr. Kaplan at Riverside's Boston office. Mr. Kaplan assured Mr. Kelly that the contract for the $1 million signing bonus was going to be fulfilled within three to four weeks after the agreement between TelJet and Riverside was finalized.

55.     On or about June 27, 2013, Mr. Kaplan, via telephone, said there would be a delay in the payment of the $1 million signing bonus because there was going to be an audit of the TelJet network immediately following the sale, which had to be concluded before Riverside could pay Mr. Kelly.

56.     On August 9, 2013, Mr. Kelly again met with Mr. Kaplan at Riverside's Boston office where Mr. Kaplan informed Mr. Kelly that Riverside was pursuing claims against the TelJet sellers, not including Mr. Kelly.  Mr. Kaplan told Mr. Kelly that the $1 million signing bonus was owed but could not be paid until the claim was resolved.

57.     One of Riverside's claims against the TelJet sellers related to the extent of the fiber optic network purchased by Riverside from TelJet.  Before the sale agreement between TelJet and Riverside was executed, Mr. Kelly fixed an error in TelJet's fiber optic network description.  This error was corrected well before the agreement was executed, and the correction

was acknowledged by Riverside, specifically Mr. Kaplan.  However, after the agreement was finalized, Riverside claimed it was misled by the TelJet equity holders as to this error.

58.     One reason Riverside excluded Mr. Kelly from the dispute was because Mr. Kelly had knowledge that Riverside knew of and acknowledged the error before the agreement was executed.

59.     Throughout the dispute with the other equity holders, Riverside concealed that it had had knowledge of the error before entering into the agreement.  However, not only did Riverside have knowledge, it openly discussed the error with managers and attorneys for TVC, the independent entity that TelJet merged with, before the execution of the agreement.  Mr. Kaplan was personally warned by attorneys that his position was legally untenable.

60.     Because Mr. Kelly knew Riverside had actual knowledge of the error and that it had been corrected, he was omitted from the dispute by Riverside so as to not reveal Riverside's fraudulent and misleading claims to the other equity holders.

61.     Riverside endeavored to conceal the nature of the dispute from Mr. Kelly so that Mr. Kelly would not reveal Riverside's feigned damage to the equity holders; however, Mr. Kelly was able to ascertain some of the nature of the dispute by other means.

62.     Riverside's actions towards both the equity holders of TelJet and Mr. Kelly evidence a pattern of using fraudulent means to avoid making full payments that are known to be owed under existing agreements.

63.     Mr. Kelly fully performed all of his duties under the contract with Riverside with the expectation that he would receive the promised payment in a timely fashion, as agreed.

64.     On October 2, 2013, Mr. Kelly attended a company-wide meeting for TVC at its office in Albany, New York.  The meeting was to announce the resignation of Mr. O'Connor as

CEO and announce the appointment of Kurt Van Wagenen ("Mr. Van Wagenen") to that position.

65.     Mr. Kaplan was at the meeting and spoke to Mr. Kelly.  Mr. Kaplan asked Mr. Kelly how he would respond if contacted by Riverside's attorney regarding the claims against the TelJet equity holders.  Mr. Kelly spoke with Mark Cahill ("Mr. Cahill"), an attorney for Riverside, who coached him how to respond to questions from TelJet's attorneys.

66.     During this conversation, Mr. Kelly reminded Mr. Kaplan of the contract for the $1 million signing bonus, and Mr. Kaplan reiterated that the dispute with the equity holders had to be resolved before Mr. Kelly could be paid.

67.     That same night, on October 2, 2013, Mr. Kelly had dinner with Mr. Van Wagenen, who stated that he knew of the contract between Mr. Kelly and Riverside, but was not aware of the details.

68.     On June 26, 2014, about eight months later, Mr. Kelly met with Mr. Kaplan at Riverside's Boston office to discuss the contract for the $1 million signing bonus, which still had not been paid.  Mr. Kaplan reiterated that the dispute between the TelJet equity holders and Riverside had to be completed, but he said that they were in the process of negotiating and should reach a resolution in the near future.

69.      On August 7, 2014, Mr. Kelly received an e-mail from Mr. Kaplan informing him that the dispute with the TelJet equity holders was resolved and that Riverside was ready to address the agreement with Mr. Kelly.

**Riverside Reneges on the Contract with Mr. Kelly**

70.     On August 20, 2014, Mr. Kelly met Mr. Kaplan and Mr. Blasco at Riverside's office in Boston.  Mr. Kaplan offered Mr. Kelly a $50,000 payment and 50,000 shares of TVC.

Mr. Kelly refused the offer, stating that they had agreed to a $1 million signing bonus on February 25, 2013, at the Boston Marriot Newton hotel.

71.     Mr. Kaplan increased the offer to $100,000.00 and 50,000 shares of TVC.  Mr. Kelly asked for the offer in writing.

72.     At no time after February 25, 2013, and before August 20, 2014, did Mr. Kaplan, Mr. Blasco, or anyone at Riverside deny that Mr. Kelly had entered into a contract for a $1 million signing bonus with Riverside.  Throughout that time, Mr. Kaplan made repeated affirmations of the contract and representations that Mr. Kelly would receive the $1 million signing bonus when the dispute with the TelJet equity holders was resolved.

73.     For the first time, on August 20, 2014, Mr. Kaplan and Mr. Blasco gave Mr. Kelly reason to believe that Riverside would not honor the contract to pay him the $1 million signing bonus in connection with his services to Riverside.

74.     Following Riverside's denial and refusal to pay the $1 million signing bonus, Mr. Kelly consulted an attorney, Hans Huessy ("Mr. Huessy") who contacted Riverside's attorney, Mr. Cahill, regarding the nonpayment of the $1 million signing bonus by Riverside.

75.     On September 16, 2014, Mr. Cahill wrote, "Regarding the meeting in Boston that Mr. Kelly had with Messrs. Kaplan and Blasco: . . . To the extent that any 'offer' was made to Mr. Kelly during that meeting, Mr. Kelly has no viable action with respect to it."

76.     Mr. Cahill then proceeded to threaten Mr. Huessy for bringing Mr. Kelly's claims of breach of contract and fraud to his attention: "Simply put, there is no good faith basis for Mr. Kelly to assert the claims you are threatening on his behalf.  In that regard, you are respectfully reminded of your own Rule 11 obligations.  As I informed you yesterday, in the event Mr. Kelly files any complaint it will be met with a vigorous defense."

77.     While on a telephone call with Mr. Huessy, Riverside also threatened non-specific, baseless counterclaims against Mr. Kelly if he pursued his claims against it, in an attempt to intimidate Mr. Kelly.

### Mr. Kelly's Employment with TVC

78.     On June 28, 2013, Mr. Kelly entered into a separate Employment Agreement with TVC to enhance sales.  Mr. Kelly received an annual salary of $124,000.00 and was eligible for bonuses.

79.     As an employee of TVC, Mr. Kelly sold services to new customers and serviced existing customers.

80.     This employment contract with TVC was separate and distinct from the contract with Riverside.  The employment contract with TVC was for a position in sales and was ongoing, whereas the contract with Riverside was to perform limited-duration transitional services relating to the selection of Riverside for the sale by TelJet and for additional liaison services to Riverside after the sale of TelJet, all of which were completed by Mr. Kelly within a few months.

81.     From the beginning of Mr. Kelly's employment with TVC in June 2013 until his voluntary resignation on August 22, 2014, Mr. Kelly performed all of his employment obligations to TVC and was timely paid by TVC.

82.     Although Mr. Kelly voluntarily resigned from TVC and was not entitled to or owed a separation or severance package by TVC, on September 3, 2014, Mr. Kelly received a proposed Separation Agreement from TVC, which included a lump-sum payment of $100,000.00.  TVC had pointed out that Mr. Kelly's voluntary resignation negated any severance obligation, and Mr. Kelly was aware of the same point throughout.  In other words, as TVC

made clear, TVC was fully aware that <u>TVC</u> did not owe Mr. Kelly severance or an additional $100,000.00, and those proposed payments were always understood by all – including Mr. Kaplan – to be a proposed payment of Riverside's obligation for <u>Riverside's</u> contract with Mr. Kelly.

83.     Riverside used TVC to offer Mr. Kelly the Separation Agreement in an attempt to subsidize what was owed by Riverside to Mr. Kelly.  In effect, Riverside attempted to saddle TVC and the investors of TVC with expenses that Riverside had committed to in its capacity as a private equity firm, thereby effectively having the investors subsidize Riverside's separate obligations.  The payments were openly acknowledged by Riverside to be for the contract that Riverside had formed in privity with Mr. Kelly (and not for any obligation of TVC to Mr. Kelly).

84.     Because Mr. Kelly voluntarily resigned, TVC did not owe him a severance package, which TVC acknowledged.  The only reason for TVC offering the Separation Agreement was an attempt to liquidate Riverside's contract for the $1 million signing bonus for a smaller amount, including payments of significant funds that there was no reason for believing were owed by TVC to Mr. Kelly.  In fact, there was not even the stirring of a dispute between Mr. Kelly and TVC, but Riverside knew it owed Mr. Kelly money, despite purporting to claim otherwise.

85.     On September 12, 2014, Mr. Kelly rejected the Separation Agreement and did not sign any release, nor receive any severance payments from TVC.

**<u>CAUSES OF ACTION</u>**

<u>COUNT I – Breach of Contract Against Riverside</u>

86.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

87.     Mr. Kelly entered into a contract with Defendant Riverside on February 25, 2013.

88.     Pursuant to that contract, Mr. Kelly was to receive a $1 million signing bonus in exchange for (i) recommending that TelJet accept Riverside's offer, (ii) using his contacts in the fiber optic network community to help Riverside optimize sales, and (iii) assisting with the transition to new ownership for TelJet.

89.     Mr. Kelly performed all of his obligations under the contract with Riverside.

90.     By refusing to pay the $1 million signing bonus, Defendant Riverside has breached its contractual obligations.

91.     As a direct and proximate result of Defendant's breach, Mr. Kelly has suffered damages in an amount to be established at trial, including, without limitation, prejudgment interest from the date of the breach, August 20, 2014.

### COUNT II – Fraud Against Riverside and Mr. Kaplan

92.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

93.     On February 25, 2013, in the lobby of the Boston Marriott Newton hotel, Mr. Kaplan represented to Mr. Kelly that Riverside would pay him a $1 million signing bonus in exchange for recommending that TelJet accept Riverside's offer and for his services to Riverside after the sale.

94.     Mr. Kaplan made the offer, which was accepted by Mr. Kelly at the meeting.

95.     Although Mr. Kaplan stated that he would not put the offer in writing, he specifically said that it was not necessary because he was a man of his word and would honor the verbal agreement.  Mr. Kaplan and Mr. Kelly (as well as Mr. Blasco) shook hands to finalize the contract.

96.     On April 25, 2013, in Riverside's Boston office, Mr. Kaplan assured Mr. Kelly that the contract for the $1 million signing bonus was going to be fulfilled within three to four weeks after the sale agreement with TelJet was executed because of a physical network audit that had to be completed following the sale.

97.     On August 9, 2013, in Riverside's Boston office, Mr. Kaplan stated that Riverside could not pay Mr. Kelly the $1 million signing bonus until disputes with TelJet's equity holders were resolved – disputes that Riverside largely concocted in an attempt to avoid paying the full purchase price of TelJet.

98.     On October 2, 2013, Mr. Kaplan made the same representation to Mr. Kelly regarding Riverside's nonpayment because of the ongoing dispute with TelJet equity holders.

99.     On June 26, 2014, eight months after their last meeting, Mr. Kaplan stated that the dispute with the TelJet equity holders was almost resolved and that payment of the $1 million signing bonus would be made when the resolution was complete.

100.    Upon information and belief, Mr. Kaplan made these representations when he knew that Riverside had no intention of paying Mr. Kelly.

101.    Mr. Kaplan made these representations to Mr. Kelly to induce Mr. Kelly to recommend the sale of TelJet to Riverside to TelJet's equity holders.

102.    Mr. Kelly would not have recommended the sale nor assisted with TelJet's transition to Riverside without the representation that he was to receive a $1 million signing bonus.

103.    On August 7, 2014, Mr. Kelly received an e-mail from Mr. Kaplan informing him that the dispute was resolved and that Riverside was ready to address the agreement with Mr. Kelly.  However, on August 20, 2014, when Mr. Kelly met Mr. Kaplan at Riverside's Boston

office, Mr. Kaplan only offered Mr. Kelly $100,000.00 of TVC's money and 50,000 shares in TVC stock instead of paying the $1 million of Riverside's money owed as a signing bonus.

104.     As a direct and proximate result of Defendants' fraud, Mr. Kelly has suffered damages in an amount to be established at trial.

<u>COUNT III – Quantum Meruit Against Riverside</u>

105.     Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

106.     On February 25, 2013, Riverside promised to pay Mr. Kelly a $1 million signing bonus in return for (i) recommending that TelJet accept Riverside's offer, (ii) using his contacts in the fiber optic network community to help Riverside optimize sales, and (iii) assisting with the transition to new ownership for TelJet.

107.     Mr. Kelly provided those benefits to Riverside with the expectation that he would be compensated by Riverside.

108.     Riverside accepted Mr. Kelly's services and benefits with the actual knowledge that he reasonably expected compensation.

109.     After February 25, 2013, and before August 20, 2014, Riverside repeatedly acknowledged that Mr. Kelly expected to be compensated for the benefits he provided Riverside.

110.     To date, Mr. Kelly has not received the promised compensation of $1 million from Riverside.

111.     As a direct and proximate cause of Riverside's failure to pay Mr. Kelly for the recommendation to TelJet to accept Riverside's offer and Mr. Kelly's services to Riverside, Mr. Kelly has suffered damages in an amount to be established at trial.

<u>COUNT IV – Promissory Estoppel Against Riverside</u>

112.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

113.    On February 25, 2013, Riverside promised to pay Mr. Kelly a $1 million signing bonus in return for (i) recommending that TelJet accept Riverside's offer, (ii) using his contacts in the fiber optic network community to help Riverside optimize sales, and (iii) assisting with the transition to new ownership for TelJet.

114.    Mr. Kelly provided those benefits to Riverside because of the representation he would be paid a $1 million signing bonus.

115.    Riverside has refused to pay Mr. Kelly the $1 million signing bonus per its representation.

116.    To date, Mr. Kelly has not received the promised compensation of $1 million from Riverside.

117.    As a direct and proximate cause of Riverside's failure to pay Mr. Kelly for the recommendation to TelJet to accept Riverside's offer and Mr. Kelly's services to Riverside, Mr. Kelly has suffered damages in an amount to be established at trial.

<u>COUNT V – Violation of M.G.L. ch. 93A, § 11 Against Riverside and Mr. Kaplan</u>

118.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

119.    Defendants engaged in unfair or deceptive acts or practices by repeatedly assuring Mr. Kelly that he would be paid the $1 million signing bonus when Riverside and Mr. Kaplan knew that Riverside had no intention of paying him.

120.     On April 25, 2013, in Riverside's Boston office, Mr. Kaplan assured Mr. Kelly that the contract for the $1 million signing bonus was going to be fulfilled within three to four weeks after the sale agreement with TelJet was executed because of a physical network audit that had to be completed following the sale.

121.     On August 9, 2013, in Riverside's Boston office, Mr. Kaplan stated that Riverside could not pay Mr. Kelly the $1 million signing bonus until disputes with TelJet's equity holders were resolved – disputes that Riverside largely concocted in an attempt to avoid paying the full purchase price of TelJet.

122.     On October 2, 2013, Mr. Kaplan made the same representation to Mr. Kelly regarding Riverside's nonpayment because of the ongoing dispute with TelJet equity holders.

123.     On June 26, 2014, eight months after their last meeting, Mr. Kaplan stated that the dispute with the TelJet equity holders was almost resolved and that payment of the $1 million signing bonus would be made when the resolution was complete.

124.     Upon information and belief, Mr. Kaplan made these representations when he knew that he and Riverside had no intention of paying Mr. Kelly.

125.     Mr. Kaplan made the representation that Riverside would pay Mr. Kelly the $1 million signing bonus so Mr. Kelly would recommend that TelJet accept Riverside's offer to purchase it, and once that was done, Riverside continually delayed paying Mr. Kelly.

126.     Riverside willfully disregarded its known contractual arrangements and intended to secure benefits and strategic advantages during TelJet's sale from Mr. Kelly.

127.     On August 7, 2014, Mr. Kelly received an e-mail from Mr. Kaplan informing him that the dispute was resolved and that Riverside was ready to address the agreement with Mr. Kelly.  However, on August 20, 2014, when Mr. Kelly met Mr. Kaplan at Riverside's Boston

office, Mr. Kaplan only offered Mr. Kelly $100,000.00 of TVC's money and 50,000 shares in TVC stock instead of paying the $1 million of Riverside's money owed as a signing bonus.

128.    Additionally, when presented with Mr. Kelly's claims for breach of contract, fraud, and breach of implied contract, Riverside threatened baseless counterclaims and Rule 11 sanctions.

129.    The unfair and deceptive conduct by Riverside and Mr. Kaplan occurred primarily and substantially in Massachusetts – the contract was entered into in Newton, Massachusetts; multiple meetings occurred at Riverside's Boston office; and the contract was breached at Riverside's Boston office.

130.    Riverside and Mr. Kaplan willfully and knowingly violated M.G.L. ch. 93A by repeatedly making representations to Mr. Kelly that payment was forthcoming when Riverside had no intention of paying him and threatening baseless counterclaims and sanctions.

131.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Mr. Kelly suffered loss of the use of the money owed to him.  Mr. Kelly relinquished any share of the proceeds from the TelJet sale in reliance on the $1 million signing bonus.  Mr. Kelly was relying on the payment to repay debts and to pay state and federal taxes, and the lack of payment has resulted in the incurrence of interest and interference in good will and relationships with friends, family, and business contacts.  Because of Riverside's nonpayment, Mr. Kelly has been forced to sell his assets, including early withdrawal from a 401(k) and consequent penalties, in order to pay bills and is unable to pay his credit card, automobile loan and to pay state and federal tax obligations.  If he had not been induced to select Riverside, he would have received $400,000.00 from TelJet's sale and would have been able to meet all of his obligations and pursue new opportunities.

132.    Due to Defendants' violations of Massachusetts statute, Mr. Kelly is entitled to recover damages, including punitive and treble damages, from Defendants, as well as reasonable attorneys' fees and costs of the action, in an amount to be determined at trial.

<u>COUNT VI – Aiding and Abetting Fraud Against Mr. Kaplan</u>

133.    Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

134.    On February 25, 2013, in the lobby of the Boston Marriott Newton hotel, Mr. Kaplan represented to Mr. Kelly that Riverside would pay him a $1 million signing bonus in exchange for recommending that TelJet accept Riverside's offer and for his services to Riverside.

135.    Mr. Kaplan made the offer, which was accepted by Mr. Kelly at the meeting.

136.    Although Mr. Kaplan stated that he would not put the offer in writing, he specifically said that it was not necessary because he was a man of his word and would honor the verbal agreement.  Mr. Kaplan and Mr. Kelly (as well as Mr. Blasco) shook hands to finalize the contract.

137.    On April 25, 2013, in Riverside's Boston office, Mr. Kaplan assured Mr. Kelly that the contract for the $1 million signing bonus was going to be fulfilled within three to four weeks after the sale agreement with TelJet was executed because of a physical network audit that had to be completed following the sale.

138.    On August 9, 2013, in Riverside's Boston office, Mr. Kaplan stated that Riverside could not pay Mr. Kelly the $1 million signing bonus until disputes with TelJet's equity holders were resolved – disputes that Riverside largely concocted in an attempt to avoid paying the full purchase price of TelJet.

139.     On October 2, 2013, Mr. Kaplan made the same representation to Mr. Kelly regarding Riverside's nonpayment because of the ongoing dispute with TelJet equity holders.

140.     On June 26, 2014, eight months after their last meeting, Mr. Kaplan stated that the dispute with the TelJet equity holders was almost resolved and that payment of the $1 million signing bonus would be made when the resolution was complete.

141.     Upon information and belief, Mr. Kaplan made these representations when he knew that he and Riverside had no intention of paying Mr. Kelly.

142.     Riverside engaged in fraudulent behavior in an attempt to avoid paying its full obligations under contracts, which is evidenced by both Riverside's dealings with Mr. Kelly and the TelJet equity holders.

143.     Mr. Kaplan knew of the fraudulent excuses for Riverside's nonpayment, but continually assured Mr. Kelly he would be paid while Mr. Kelly fulfilled his obligations under the contract.

144.     Mr. Kaplan made these representations to Mr. Kelly to induce Mr. Kelly to recommend the sale of TelJet to Riverside to TelJet's equity holders and to assist in Riverside's nonpayment.  Mr. Kaplan is jointly and severally liable for Riverside's fraudulent conduct, and *vice versa*.

145.     On August 7, 2014, Mr. Kelly received an e-mail from Mr. Kaplan informing him that the dispute was resolved and that Riverside was ready to address the agreement with Mr. Kelly.  However, on August 20, 2014, when Mr. Kelly met Mr. Kaplan at Riverside's Boston office, Mr. Kaplan only offered Mr. Kelly $100,000.00 of TVC's money and 50,000 shares in TVC stock instead of paying the $1 million of Riverside's money owed as a signing bonus.

146. As a direct and proximate result of Mr. Kaplan's aiding and abetting fraud, Mr. Kelly has suffered damages in an amount to be established at trial.

<u>COUNT VII – Civil Conspiracy by Concerted Action Against Mr. Kaplan</u>

147. Plaintiff restates the allegations contained in the paragraphs above as if fully set forth herein.

148. On February 25, 2013, in the lobby of the Boston Marriott Newton hotel, Mr. Kaplan represented to Mr. Kelly that Riverside would pay him a $1 million signing bonus in exchange for recommending that TelJet accept Riverside's offer and for his services to Riverside.

149. Mr. Kaplan made the offer, which was accepted by Mr. Kelly at the meeting.

150. Although Mr. Kaplan stated that he would not put the offer in writing, he specifically said that it was not necessary because he was a man of his word and would honor the verbal agreement.  Mr. Kaplan and Mr. Kelly (as well as Mr. Blasco) shook hands to finalize the contract.

151. On April 25, 2013, in Riverside's Boston office, Mr. Kaplan assured Mr. Kelly that the contract for the $1 million signing bonus was going to be fulfilled within three to four weeks after the sale agreement with TelJet was executed because of a physical network audit that had to be completed following the sale.

152. On August 9, 2013, in Riverside's Boston office, Mr. Kaplan stated that Riverside could not pay Mr. Kelly the $1 million signing bonus until disputes with TelJet's equity holders were resolved – disputes that Riverside largely concocted in an attempt to avoid paying the full purchase price of TelJet.

153.    On October 2, 2013, Mr. Kaplan made the same representation to Mr. Kelly regarding Riverside's nonpayment because of the ongoing dispute with TelJet equity holders.

154.    On June 26, 2014, eight months after their last meeting, Mr. Kaplan stated that the dispute with the TelJet equity holders was almost resolved and that payment of the $1 million signing bonus would be made when the resolution was complete.

155.    Upon information and belief, Mr. Kaplan made these representations when he knew that Riverside had no intention of paying Mr. Kelly.

156.    Riverside engaged in fraudulent behavior in an attempt to avoid paying its full obligations under contracts, which is evidenced by both Riverside's dealings with Mr. Kelly and the TelJet equity holders.

157.    Mr. Kaplan knew of the fraudulent excuses for Riverside's nonpayment, but continually assured Mr. Kelly he would be paid while Mr. Kelly fulfilled his obligations under the contract.

158.    Mr. Kaplan made these representations to assist in Riverside's nonpayment, which substantially assisted in Riverside's breach of contract and fraudulent acts.  Mr. Kaplan is jointly and severally liable for Riverside's fraudulent conduct, and *vice versa*.

159.    On August 7, 2014, Mr. Kelly received an e-mail from Mr. Kaplan informing him that the dispute was resolved and that Riverside was ready to address the agreement with Mr. Kelly.  However, on August 20, 2014, when Mr. Kelly met Mr. Kaplan at Riverside's Boston office, Mr. Kaplan only offered Mr. Kelly $100,000.00 of TVC's money and 50,000 shares in TVC stock instead of paying the $1 million of Riverside's money owed as a signing bonus.

160.    Riverside and Mr. Kaplan acted in concert to avoid Riverside's payment of a known contractual obligation to Mr. Kelly.

161.    As a direct and proximate result of Mr. Kaplan's civil conspiracy with Riverside, Mr. Kelly has suffered damages in an amount to be established at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Mr. Kelly prays that this Court grant him the following relief:

1.    That judgment be entered for Mr. Kelly on his claims against Defendants for damages, punitive damages, treble damages, interest and costs.

2.    That attorneys' fees be assessed against Defendants.

3.    That the Court grant Mr. Kelly such other and further relief as it considers just and proper, including prejudgment interest.

## DEMAND FOR JURY TRIAL

Mr. Kelly demands a trial by jury on all claims so triable.


Respectfully Submitted,

**GREGORY KELLY**

By his attorneys,

By: /s/ David J. Shlansky
David J. Shlansky, BBO No. 565321
Colin R. Hagan, BBO No. 684798
SHLANSKY LAW GROUP, LLP
1 Winnisimmet Street
Chelsea, MA 02150
Phone: (617) 497-7200
Fax:    (866) 257-9530
E-mail: David.Shlansky@slglawfirm.com
          Colin.Hagan@slglawfirm.com

August 19, 2016