UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GREGORY KELLY,                    )
                                  )
              Plaintiff,          )        CIVIL ACTION NO.
                                  )        16-11694-DPW
v.                                )
                                  )
RIVERSIDE PARTNERS, LLC, and      )
STEVEN KAPLAN,                    )
                                  )
              Defendants.         )

MEMORANDUM
AND
ORDER FOR JUDGMENT
July 25, 2019

Plaintiff, Gregory Kelly, brought this action against Defendants, Riverside Partners, LLC and Steven Kaplan, based on an alleged $1 million signing bonus agreement he had with them. Defendants denied the existence of such an agreement and, in turn, asserted an indemnification counterclaim against Mr. Kelly for pursuing this litigation.  Mr. Kelly responded with his own counterclaim against the Defendant for breach of a settlement agreement.

Cross-motions for summary judgment were presented to me by the parties as to the Defendants' counterclaim, and Defendant separately sought summary judgment as to Plaintiff's claims and counterclaim.  I orally granted Defendants' motion for summary judgment and now, following further briefing, award $250,000 damages, with pre- and post-judgment interest, to Riverside.

This Memorandum fully provides my reasons for these determinations.

## I. BACKGROUND

### A.   *Factual Background*

#### 1.   The Entities Involved in the Transaction

In 2006, Vermont Fiberlink, LLC ("VFL"), an entity principally owned by Scott Pidgeon, Kenneth Pidgeon, and Alan Pidgeon (collectively "the Pidgeons"), and TelJet, Inc., formed an entity called TelJet Longhaul, LLC ("TelJet").  TelJet built, managed, leased, and maintained a fiber optic communications network and offered telecommunications services, custom solutions for Internet service, point-to-point circuits, and leasing of dark fiber.  **Plaintiff, Gregory Kelly**, served as president of TelJet.

Tech Valley Holdings, LLC ("Tech Valley"), is a portfolio company of **Defendant, Riverside Partners, LLC ("Riverside")**, a Boston-based private equity firm.

TVC Albany, Inc., a/k/a Tech Valley Communications ("TVC"), was a wholly-owned subsidiary of Tech Valley until TVC was sold on September 7, 2016.

TJL Acquisition Company, LLC ("TJL Acquisition"), was a wholly-owned subsidiary of TVC until TJL Acquisition dissolved in May 2013.

2.    The Transaction

Around the Fall of 2010, Riverside identified TelJet as a potential acquisition target for its portfolio company, Tech Valley.  TelJet had substantial debt, including trade and infrastructure debt, which led to the decision to sell the company.

In 2011, Ian Blasco and **Defendant, Steven Kaplan** (an employee of Riverside who served on the boards of various entities at issue, including Tech Valley and TVC), met with Mr. Kelly and the Pidgeons in Burlington, Vermont to discuss TelJet's performance and the potential for Tech Valley to invest in TelJet.

In 2012 and 2013, Mr. Kaplan and Mr. Blasco had several meetings with Mr. Kelly to discuss both the potential acquisition of TelJet by Tech Valley and Mr. Kelly's post-acquisition role.  Discussions regarding Mr. Kelly's post-acquisition role began on November 8, 2012.

On December 14, 2012, Mr. Kelly (and others) executed a letter of intent ("LOI") with Riverside affiliates outlining a non-binding proposal for the purchase of the assets of TelJet. The non-binding proposal was said to be "on behalf of Tech Valley [], a portfolio company of Riverside," with the ultimate "Bidding Entity" to be TVC.  The LOI set forth a "potential transaction structure" of $6.5 million for the purchase of

3

TelJet's assets ($4.2 million cash and $2.3 million equity shares), subject to completion of due diligence, execution of a definitive Asset Purchase Agreement, and execution of mutually acceptable employment agreements designed to keep TelJet management, including Mr. Kelly, at the combined TVC-TelJet company post-transaction.  The LOI was signed by Mr. Kaplan and Mr. Kelly.

On March 27, 2013, pursuant to an Asset Purchase Agreement ("APA"), TelJet's assets were sold to Tech Valley.  The transaction closed on June 28, 2013.

As contemplated in the APA, in conjunction with the closing of the TelJet transaction, Mr. Kelly entered into an employment agreement with TVC.  Under his employment agreement, Mr. Kelly was to receive an annual salary of $124,000 and an "annual bonus of up to $25,000."

### 3.   The APA and its Relevant Provisions

Defendants Riverside and Steven Kaplan were never parties to the APA.  The APA initially defined "Purchaser" as TJL Acquisition.

Shortly after the APA was entered into, an Amendment to the APA was executed, with this to be effective at the closing of the sale.  Among other things, this Amendment amended and restated the preamble of the APA.  The "Purchaser" was now to be

TVC.  Mr. Kelly, Kenneth Pidgeon, Mr. Kaplan, and Douglas Hyde signed the Amendment.

Effective as of March 28, 2013, an Assignment and Assumption Agreement ("AAA") was entered into between TJL Acquisition and TVC.  Pursuant to this AAA, TJL Acquisition "assign[ed] all of its rights and obligations under the [APA] . . . ."  The AAA stated that "[f]or the avoidance of doubt, references to the "Purchaser" in the [APA] shall be deemed to be references to TVC . . . ."  Mr. Kelly,Mr. Kaplan, and Kenneth Pidgeon signed the AAA.

Section 3.26 of the APA provided that "Affiliate" would have the meaning ascribed to it in Rule 405 of the Securities Act of 1933, which defines the term as "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified."  17 C.F.R. § 230.405.  Rule 405 further provides, "[t]he term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *Id.*

Article 2 of the APA dealt with representations and warranties concerning the Sellers, of which Mr. Kelly was one by terms of the preamble paragraph of the APA  Specifically,

Section 2.1 provided that "[t]he execution, delivery and performance of this [APA] . . . will not . . . be in conflict with . . . or cause the acceleration of any obligation . . . under any . . . agreement [or] contract . . . to which the Seller is a party . . . ."  Section 3.23(f) provided that "[t]he consummation of the Transactions contemplated by this [APA] will not . . . (iii) increase the amount of compensation or benefits due to any individual."

Article 9 of the APA provided for indemnification for any breaches of the covenants or representations and warranties. Specifically, Section 9.1 states that "[n]o action for a breach of the representations and warranties contained herein shall be brought more than eighteen months following the Closing Date, except for (a) claims arising out of the representations and warranties contained in ARTICLE 2 or Sections 3.4(a), 3.11(b)-(c) or 3.26, which shall survive indefinitely after the Closing . . . and (d) claims based upon fraud."

Section 9.4(a) directed that:

The Selling Entities and the Sellers shall jointly and severally indemnify and hold the Purchaser and its Affiliates (the "Purchaser Indemnified Parties") harmless from and against all claims, liabilities, obligations, costs, damages, losses and expenses (including reasonable attorneys' fees and costs of investigation) of any nature (collectively, "Losses") arising out of or relating to (i) any breach or violation of the representations or warranties of any of the Sellers (other than those set forth in ARTICLE

2) or the Selling Entities set forth in this [APA]
(including the Schedules hereto) or in any certificate
or document delivered pursuant to this [APA], (ii) any
breach or violation of the covenants or agreements of
the Selling Entities set forth in this [APA], (iii)
any breach or violation of the covenants or agreements
of the Sellers set forth in this [APA] . . . .

Section 9.4(b) stated that "[e]ach Seller shall severally,
but not jointly, indemnify and hold the Purchaser Indemnified
Parties harmless from and against all Losses arising out of or
relating to (i) any breach of violation of the representations
or warranties of such Seller in ARTICLE 2 of this [APA] . . . ."

Section 9.3, however, set limitations on indemnifications.
Section 9.3 provides that:

If the Closing occurs, the Purchaser Indemnified
Parties (as hereinafter defined) shall not be entitled
to recover any Losses (as hereinafter defined) for
breach of the representations and warranties of the
Sellers and/or the Selling Entities contained herein
(a) unless and until the Purchaser Indemnified
Parties' aggregate claims therefor exceed $50,000, in
which event the Purchaser Indemnified Parties shall be
indemnified for all such Losses in excess of, but not
including such $50,000 (the "Basket"), or (b) for an
aggregate amount in excess of $3,000,000 (which amount
includes the Escrow) (the "Cap") . . . provided, that
claims based upon fraud or for breach of the Uncapped
Representations [i.e., the representations and
warranties contained in ARTICLE 2] shall not be
subject to the foregoing limits, including the Cap and
Basket . . . .

Section 10.2 of the APA provided that the APA:

[S]hall be governed by and construed in accordance
with the internal laws of the State of Delaware
applicable to agreements executed and to be performed

solely within such State.  Any judicial proceeding
arising out of or relating to this [APA] shall be
brought in the courts of the State of Delaware, and,
by execution and delivery of this [APA], each of the
parties to this [APA] accepts the exclusive
jurisdiction of such courts, and irrevocably agrees to
be bound by any judgment rendered thereby in
connection with this [APA].

4.   Post-Closing Issues and Settlement Agreement

On October 8, 2013, Tech Valley and TVC gave Notice of

Claims for Indemnification under the APA against TelJet, VFL,

and the Pidgeons, for alleged breaches of certain

representations and warranties contained in the APA.  Tech

Valley and TVC did not give formal notice at that time of any

claim for indemnification against Mr. Kelly.

The dispute which was the subject of the October 8, 2013

Notice was settled on July 31, 2014 with a settlement agreement.

The settlement agreement sets out the parties as:

> Tech Valley Holdings, LLC, and TVC Albany, Inc., n/k/a
> FirstLight Fiber (collectively, the "Tech Valley
> Parties") on the one hand, and TelJet Longhaul, LLC,
> TelJet, Inc., Vermont Fiberlink, LLC, Alan Pidgeon,
> Scott Pidgeon, Kenneth Pidgeon, and Douglas Hyde
> (collectively "TelJet Parties"), on the other hand.
> The Tech Valley Parties and the TelJet Parties are
> hereinafter referred to collectively as the "Parties"
> and each individually as a "Party."

The parties to this settlement agreement thus were

expressly only Tech Valley and TVC, and TelJet, VFL, the

Pidgeons, and Douglas Hyde.

Section IV.A of the settlement agreement contained mutual general releases and covenants not to sue.  This section provided that:

> Each of the Tech Valley Parties, on behalf of themselves and each of their respective subsidiaries, predecessors, successors and assigns (collectively the "Tech Valley Releasing Parties"), hereby:
>
> 1. Fully finally and forever acquit, waive, release, and forever discharge all of the TelJet Parties and each of their respective predecessors, successors, affiliates, shareholders, equity holders, partners, members, managers, officers, directors, agents, investors, trustees, administrators, executors, heirs, family members, attorneys, assigns and insurers (collectively the "TelJet Released Parties") from and against any and all claims, demands, suits, orders, decrees, complaints, counterclaims, cross-claims, arbitrations, actions, counts, third-party actions, rights, benefits, liabilities, duties, requests, letters, notices, subpoenas, lawsuits, administrative proceedings, inquiries, directives, appraisals, notices, statutory or regulatory duties or obligations, claims of any entity, mediations, causes of action and any other assertions of cost or liability of any kind, nature of type whatsoever, whether legal or equitable, and whether currently known or unknown, fixed or contingent, mature or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen and whether sounding in tort, contract, contribution indemnification, subrogation, equity, negligence, strict liability or any statutory, regulatory, administrative or common law cause of action, duty or obligation of any sort (collectively, "Claims") that any of the Tech Valley Releasing parties has, had and/or may in the future have against any of the TelJet Released Parties arising from, involving the subject matter of and/or relating in any way to any act and/or omission of any type, nature or description that occurred or allegedly occurred at any time . . . .

Importantly, at no time were either Defendant Riverside or Defendant Kaplan a subsidiary, predecessor, successor, or assign of Tech Valley or TVC.

Section IV.D of the settlement agreement provided:

> Notwithstanding anything to the contrary above, insofar as the releases and covenants described in Sections A and B above extend to or otherwise include persons who are current or former employees of any of the Tech Valley Parties, such releases and covenants (i) shall extend only to affirmative Claims made by any Party relating to and/or arising out of the APA, and (ii) shall not prevent any Party from asserting defenses or counterclaims relating to and/or arising out of the APA against any current or former employees of any of the Tech Valley Parties in the event any such person first commences a lawsuit, arbitration proceeding or other formal legal claim against the Party.

On August 22, 2014, Mr. Kelly voluntarily[1] resigned from TVC.  On September 12, 2014, Mr. Kelly rejected an offered separation agreement and did not sign any release, nor did he receive any severance payments from TVC.

**B.   *Procedural History***

On August 19, 2016, Mr. Kelly filed the Complaint in this action.  The Complaint sought redress against Riverside and Mr. Kaplan for: (i) breach of contract by Riverside; (ii) fraud by Riverside and Mr. Kaplan; (iii) quantum meruit from Riverside;

---

[1]  Although Mr. Kelly appears to dispute that he "voluntarily" resigned, any such dispute is belied by his Complaint which alleges  — and thus admits — that he did in fact "voluntarily" resign.

(iv) promissory estoppel by Riverside; (v) unfair or deceptive acts or practices by Riverside; (vi) aiding and abetting fraud by Mr. Kaplan; and (vii) civil conspiracy by Mr. Kaplan.

On January 27, 2017, in an amended answer, Defendants added a counterclaim for indemnification against Mr. Kelly.

On February 17, 2017, in an answer to Defendants' counterclaim, Mr. Kelly filed his own counterclaim for breach of the settlement agreement against the Defendants.

On August 4, 2017, the Defendants filed a motion for summary judgment on all claims and counterclaims.  On the same day, Mr. Kelly filed a motion for summary judgment as to Defendants' counterclaim.

At the conclusion of the hearing on December 19, 2017 regarding the parties' motions for summary judgment, I granted Defendants' motion for summary judgment, and denied Plaintiff's motion for summary judgment and motion to strike and exclude evidence.  On the issue of damages, however, I requested further briefing.  Supplemental submissions on damages were received shortly thereafter.

I held a hearing on February 28, 2018 regarding the issue of damages.  As a result of issues developed at the hearing, I requested further materials concerning attorneys' fees.  The parties filed their responses and replies in due course.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010). "A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit." *Id.* at 5.

"The moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact." *Id.* After the moving party has met this threshold, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Id.* "If the nonmovant fails to make this showing, then summary judgment is appropriate." *Id.* In ruling on the motions, I "constru[e] the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor." *Rochester Ford Sales, Inc.*

v. *Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir. 2002) (citation omitted).

When presented with cross-motions for summary judgment, I must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *Green Mountain Realty Corp.* v. *Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *D & H Therapy Assocs., LLC* v. *Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011)).

### III. ANALYSIS

At the outset, I must take up two threshold issues: the relevance of the APA's forum-selection clause and Mr. Kelly's Motion to Strike evidence presented by Defendants for consideration in connection with the summary judgment motions.

### A.    *Forum Selection Clause*

The inclusion of a forum-selection clause in Section 10.2 of the APA presents the issue whether this court is the proper forum for resolving this dispute and, if it is, what substantive law should be applied.  Mr. Kelly contends that, pursuant to the forum-selection clause, the Defendants' counterclaim must be brought in Delaware and therefore must be dismissed in this litigation.

Generally, a valid forum-selection clause should be enforced "in all but the most exceptional cases." *Atl. Marine Const. Co.* v. *U.S. Dist. Court for W. Dist. of Texas*, 571 U.S.

49, 60 (2013) (citation and internal quotation marks omitted).

Enforcing a forum-selection clause protects the parties'

"legitimate expectations and furthers vital interests of the

justice system." *Id.* at 63 (citation and internal quotation

marks omitted).

The Supreme Court has recognized that a forum-selection

clause may, however, be found unenforceable where:

> (1) the clause was the product of "fraud or overreaching,"
> (2) "enforcement would be unreasonable and unjust," (3)
> proceedings "in the contractual forum will be so gravely
> difficult and inconvenient that [the party challenging the
> clause] will for all practical purposes be deprived of his
> day in court," or (4) "enforcement would contravene a
> strong public policy of the forum in which suit is brought,
> whether declared by statute or by judicial decision."

*Huffington* v. *T.C. Grp., LLC*, 637 F.3d 18, 23 (1st Cir. 2011)

(quoting *The Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1 (1972))

(internal citations omitted; alterations in original).

Forum-selection clauses are generally given effect through

transfer to the contractually selected forum pursuant to 28

U.S.C § 1404(a). *Atl. Marine Const. Co.*, 571 U.S. at 59.

However, if the forum-selection clause points to a state or

foreign tribunal to which transfer is not possible, the

appropriate mechanism to enforce the clause is through the

doctrine of *forum non conveniens*. *Id.* at 60.

As to interpretation, the forum-selection clause in the APA

mandatorily states proceedings "shall" be brought in "the courts

of the State of Delaware."  This raises the question whether "courts of the State of Delaware" is limited to state courts or also encompasses federal courts situated in Delaware.  Federal courts by definition are not "courts of" the state in which they are situated; consequently, I read the forum-selection clause as limited to Delaware state courts.  *See, e.g.*, *LFC Lessors, Inc.* v. *Pac. Sewer Maint. Corp.*, 739 F.2d 4, 7 (1st Cir. 1984) (phrase "courts of the Commonwealth of Massachusetts" means Massachusetts state courts); *see also Doe 1* v. *AOL LLC*, 552 F.3d 1077, 1081–1082 (9th Cir. 2009) (per curiam) ("Courts of Virginia" means the state courts of Virginia, and "does not also refer to federal courts in Virginia."); *American Soda, LLP* v. *U.S. Filter Wastewater Group, Inc.*, 428 F.3d 921, 926 (10th Cir. 2005) (courts "of Colorado" exclusively refers to state courts because "a federal court located in Colorado is not a court of the State of Colorado but rather a court of the United States of America."); *Dixon* v. *TSE Intern. Inc.*, 330 F.3d 396, 398 (5th Cir. 2003) (per curiam) (same with regard to "Courts of Texas").

I cannot transfer a case initiated in this court to a state court, even if I were to find the forum-selection clause enforceable.  Consequently, whether dismissal is appropriate would ordinarily be analyzed pursuant to the doctrine of *forum non conveniens*.  However, I need not reach that issue because I

find that the forum-selection clause as to Defendants'
counterclaim unenforceable by Plaintiff for two main reasons.

First, Mr. Kelly himself chose to file his suit in this
jurisdiction despite the fact that his claims appear themselves
to be governed by the forum-selection clause in the APA because
they invoke a "judicial proceeding arising out of or relating to
[the APA]".  But for the APA, his claim would not have arisen;
his alleged $1 million side-deal is based on arranging and
consummating the APA and TelJet transaction.  *See Kebb Mgmt.,
Inc.* v. *Home Depot U.S.A., Inc.*, 59 F. Supp. 3d 283, 289 (D.
Mass. 2014) (the terms "relating to" or "in connection with" are
"generally construed quite broadly"); *Somerville Auto Transp.
Serv., Inc.* v. *Auto. Fin. Corp.*, 691 F. Supp. 2d 267, 272 (D.
Mass. 2010) ("[T]he present litigation could not have occurred
absent the pertinent agreements" and therefore were actions
"relating to" the contract and therefore governed by the forum-
selection clause).

In light of Mr. Kelly's own disregard of the forum-
selection clause in initiating this case, I concluded that he
had waived the enforcement of the clause.  Mr. Kelly may not
selectively seek to enforce a forum-selection clause that he has
already violated and ignored.  *See*, *e.g.*, *Jalin Realty Capital
Advisors, LLC* v. *A Better Wireless, NISP, LLC*, No. CIV. 11-0165
JRT/LIB, 2012 WL 838439, at *3 (D. Minn. Mar. 12, 2012)

16

("[P]laintiff waives venue privileges with respect to any counterclaim, either permissive or compulsory, when he commences an action in a forum where venue otherwise would not lie") (citation and internal quotation marks omitted); *Electro-Mech. Corp.* v. *Riter Eng'g Co.*, No. 2:10-CV-975 TS, 2011 WL 2118704, at *4 (D. Utah May 25, 2011) (forum-selection clause waived where Plaintiff "chose to bring its claim in a separate forum and only sought to enforce the clause after counterclaims were brought against it under the Agreement"); *In re Rationis Enterprises, Inc. of Panama*, No. 97 CV 9052 (RO), 1999 WL 6364, at *2 (S.D.N.Y. Jan. 7, 1999) ("[F]orum selection clause will be deemed waived if the party invoking it has taken actions inconsistent with it, or delayed its enforcement, and other parties would be prejudiced") (citation and internal quotation marks omitted).

Second, and more practically, enforcing the forum-selection clause at the ultimate dispositive motion stage of this litigation and thereby dismissing the entire case would be "unreasonable and unjust," especially since the full course of discovery and several rounds of motion practice have proceeded in this court. Forcing the parties to start over *ab initio* in Delaware state court at this stage would be an unreasonably unjust and belated exercise in moving the horse to a different barn at the instance of a party who chose the initial barn to

contain it in the first place.  This is an exercise that hardly
conduces to securing a just, speedy and inexpensive
determination of this action.  *C.f.* Fed. R. Civ. P. 1.

For these reasons, insofar as it relates to venue (as
opposed to choice-of-law, which clearly looks to the law of
Delaware, a proposition neither party disputes), I concluded the
forum-selection clause in the APA was unenforceable in this
litigation by the time the issue was raised by Mr. Kelly.

**B.    *Plaintiff's Motion to Strike***

In his motion to strike, Mr. Kelly claimed that Defendants
failed to produce any evidence of alleged damages during
discovery, and that this deprived him of an opportunity to
inquire into this essential element of Defendants' counterclaim.

Mr. Kelly argued that Defendants should not be permitted to
rely on documentary evidence produced two months after the close
of discovery and requested that I strike the portions of
Defendants' motion "that rely on invoices and other records
supposedly supporting Defendants' attorneys' fees, as Defendant
refused to produce such documents in discovery, without
substantial justification."

Under Rule 37 of the Federal Rules of Civil Procedure, a
court, of course, has the power to preclude a party from
introducing evidence and strike pleadings in whole or in part

for a party's failure to comply with discovery.  Furthermore,

Rule 26, in relevant part, provides that:

> [A] party must, without awaiting a discovery request,
> provide to the other parties . . . a computation of each
> category of damages claimed by the disclosing party — who
> must also make available for inspection and copying as
> under Rule 34 the documents or other evidentiary material,
> unless privileged or protected from disclosure, on which
> each computation is based, including materials bearing on
> the nature and extent of injuries suffered.

Fed. R. Civ. P. 26(a)(1)(A)(iii).

Under the governing scheduling order, fact discovery

concluded on June 16, 2017.  Mr. Kelly contended that

"Defendants delayed for more than two months after the close of

discovery to produce invoices and bills that supposedly support

their damages (*i.e.*, attorneys' fees)" (emphasis removed).

It is undisputed that on September 2, 2017, Defendants'

filed several exhibits, specifically invoices, detailing the

attorneys' fees which had not been produced prior to that

filing.  The exhibits were filed in conjunction with Defendants'

opposition to Mr. Kelly's motion for summary judgment.

Notwithstanding Rule 26, on January 20, 2017 in Mr. Kelly's

first set of discovery requests, Mr. Kelly asked for "[a]ll

Documents or Communications Concerning Mr. Kelly in connection

with the indemnification claim asserted by You, Tech Valley, or

TVC with respect to the APA."  Then on May 12, 2017 in Mr.

Kelly's second set of discovery requests, Mr. Kelly requested

Defendants "[d]escribe in detail the complete basis for any indemnity claim made with respect to the APA or the Sale by You, Tech Valley, or TVC." Defendants responded to this interrogatory on May 31, 2017. Part of their response included that "Riverside and Kaplan ha[d] suffered and continue[d] to suffer Losses as defined in Section 9.4 of the APA, including but not limited to their attorneys' fees incurred in response to Mr. Kelly's Complaint and Counterclaim, plus interest and associated costs." The response further asserted that "[t]he recoverable Losses incurred to date include[d] Riverside and Kaplan's expenditure of legal fees in excess of $250,000, which will exceed the $250,000 deductible under their insurance policy, and such other legal fees and other expenses for which insurance recovery ultimately [wa]s not obtained." Mr. Kelly never specifically requested attorneys' fees invoices during discovery.

Additionally, Defendants, in their statement of undisputed material facts in support of their motion for summary judgment plainly asserted that Mr. Kaplan and Riverside expended recoverable losses of at least $250,000 in attorneys' fees and costs. Moreover, on June 15, 2017, an email from Defendant's counsel to Mr. Kelly's counsel made clear that Mr. Kaplan contended "Riverside ha[d] to date paid $250,000.00 in attorneys' fees and related costs to cover the deductible on its

20

insurance policy[,]" which was produced to counsel.   The email explained that "[t]he remainder of the bills ha[d] been submitted to the insurer for coverage and payment, but ha[d] not been paid."   The email included that "although [Mr. Kelly's] interrogatory did not ask specifically for costs, Riverside ha[d] also received separate bills totaling $29,541.44 from a third-party document collection and production vendor" and that "Riverside ha[d] paid 924,582.43 of those costs directly to help meet the $250,000.00 deductible."   This email was sent before the end date of discovery.

In my view, these timely disclosures were enough for Mr. Kelly to have been on notice to ask for more specific disclosures from Defendants if he chose to do so.   There was no prejudice to Mr. Kelly that was not self-inflicted by his failure to follow up.   In any event, the invoices that were provided offered adequate support for Defendants' claim of meeting the alleged damages threshold in the APA.   Moreover, in supplemental submissions I ordered during consideration of the cross motions for summary judgment, Mr. Kelly was provided with all further discovery that he could have needed.   There was no good reason to grant Mr. Kelly's motion to strike; consequently, I denied it.

**C.   *Cross-Motions for Summary Judgment as to Indemnity Claim***

Both Mr. Kelly and the Defendants sought summary judgment on the Defendants' counterclaim for indemnification.

### 1.   Defendants' Status as "Affiliates"

The APA requires that the Sellers and Selling Entities indemnify "the Purchaser and its Affiliates" for their breaches of their representations and warranties.  Therefore, the threshold issue for Defendants' indemnity claims is whether Defendants, Riverside and Mr. Kaplan, meet the APA's definition of the Purchaser's "Affiliates".

Section 3.26 of the APA defined the term "Affiliate," directing attention to the definition in SEC Rule 405 under the Securities Act of 1933.  Under Rule 405, the time for qualifying as an "Affiliate" is at the time of the relevant transactions. *See SEC* v. *Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1089 (9th Cir. 2010) ("We hold that Intermedia was an affiliate of Platforms *at the time of the transactions*") (emphasis added).

Under Rule 405, an "affiliate" is "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified."  17 C.F.R. § 230.405.  Rule 405 explains that "[t]he term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the

management and policies of a person, whether through the
ownership of voting securities, by contract, or otherwise." *Id.*

Accordingly, "[c]ontrol is not to be determined by
artificial tests, but is an issue to be determined from the
particular circumstances of the case.  Under Rule 405 . . . it
is not necessary that one be an officer, director, manager, or
even shareholder to be a controlling person.  Further, control
may exist although not continuously and actively exercised."
*Platforms Wireless Int'l Corp.*, 617 F.3d at 1087 (quoting
*Pennaluna & Co.* v. *SEC*, 410 F.2d 861, 866 (9th Cir. 1969))
(internal quotation marks omitted; omission in original).
However, "a person who serves as a director or executive officer
for a corporation, or who occupies a comparable position for
other business entities, is a strong candidate for affiliate
status."  *In re Asian Yard Partners*, Nos. 95-333-PJW, 95-334-
PJW, 1995 WL 1781675, at *17 (Bankr. D. Del. Sept. 18, 1995)
(citation omitted).  Furthermore, "[o]wnership is one means of
control, but it is not the only means, and multiple persons can
exercise control simultaneously."  *Platforms Wireless Int'l
Corp.*, 617 F.3d at 1088.  What is essential to establish control
is that a "plaintiff must show that the defendant actually
participated in, or exercised control over, the operations of
the corporation in general and had the power to control the
specific transaction in question."  *Bray* v. *R.W. Tech., Inc.*,

Civ. A. No. 88-0470-Z, 1990 WL 44084, at *1 (D. Mass. Apr. 3, 1990).

For example, in *Waldman ex rel. Elliott Waldman Pension Trust v. Riedinger*, a settlement agreement was approved for "all persons and entities that purchased shares of common stock of Olsten Corporation" within a specific time period.  423 F.3d 145, 147 (2d Cir. 2005).  However, certain categories of stockholders were excluded, including affiliates of the defendants.  *Id.*  The Second Circuit held that Riedinger did not qualify as an affiliate of the defendants "because he neither controlled nor was controlled by any of the defendants."  *Id.* at 151.  The Second Circuit reasoned that although Riedinger was the trustee of numerous trusts connected to the defendants, he was a merely a "trustee in name," having never been consulted as to the actions of the trusts or even informed as to any of the meetings of the trustees; he was essentially ignored by the other trustees.  *Id.*

In this case, both Defendants contend that each was, at all relevant times (from signing of the APA up until at least the filing of Mr. Kelly's complaint), an "Affiliate" of the "Purchaser" (both TVC[2] and TJL Acquisition) because Riverside and

---

[2]  Mr. Kelly attempts to make an argument that TVC was never a "purchaser" under the APA due to alleged deficiencies in the AAA between TJL Acquisition and its parent, TVC.  Regardless of the merits of this argument — about which I am dubious — because I

Mr. Kaplan "directly controlled" both TVC and TJL Acquisition and the TelJet transaction.  Specifically, Mr. Kaplan, who served as Chairman of the Board (of Managers) of Tech Valley and Chairman of the Board (of Directors) of TVC, and others at Riverside, at all times orchestrated and controlled the decisions of those companies as to whether and on what terms to sign the APA, purchase the TelJet assets, and enter into employment terms with Mr. Kelly.  Significantly, Tech Valley and TVC entirely controlled TVC's wholly-owned subsidiary, TJL Acquisition.  TVC was the sole member of TJL Acquisition and Mr. Kaplan, as Chairman of the Board of Tech Valley and TVC, was specifically authorized to sign agreements for TJL Acquisition exercising all of TJL Acquisition's rights, powers, and privileges with respect to the APA and the TelJet transaction.

Additionally, Mr. Kaplan, in an affidavit, averred without contradiction that "Riverside through its employees thereby controlled the Board and company decisions of both Tech Valley and TVC."  Tech Valley's Limited Liability Company Agreement provided that "any Manager who is also an employee of Riverside Partners, LLC is sometimes referred to herein as a 'Riverside Manager.'"  It further stated that "[i]f at any time the current Riverside Manager(s) constitute less than a majority of the

---

find that the Defendants were affiliates of both TVC and TJL Acquisition, I need not definitely resolve the issue.

Managers then in office, the Riverside Manager(s) shall be deemed to have a sufficient number of votes to constitute a majority of the Board." Such a provision allows for Riverside to retain the majority vote. Similarly, the TJL Acquisition's Limited Liability Company Agreement stated that TVC is the sole Member and that "[t]he management of [TJL Acquisition] and its business and affairs shall be vested solely in [TVC]."

Accordingly, the undisputed facts in the record demonstrate that Defendants actually participated in, or exercised control over, the operations of the Purchaser in general and had the power to control execution of the APA.

Defendants also contend that Riverside, Mr. Kaplan, Tech Valley, TVC, and TJL Acquisition were all ultimately under the "common control" of David Belluck, because Mr. Belluck owned and controlled all of Riverside, its employees, Tech Valley, TVC, and TJL Acquisition through a series of Riverside entities owning Tech Valley. He is also the managing member of, and controls, Riverside Partners IV, LLC. Riverside Partners IV, LLC is the general partner of, and controls, Riverside Partners IV, L.P. Riverside Partners IV, L.P., in turn, is the general partner of, and controls, Riverside Fund IV, L.P. (and Riverside Fund IV Offshore L.P.). Riverside Fund IV, L.P. (and Offshore L.P.) own(s) and control(s) Tech Valley through the ultimate ability to appoint Tech Valley's Board of Managers. This chain

of command establishes Mr. Belluck's common control of the Purchaser, *i.e.*, TVC and TJL Acquisition, and Affiliates of the Purchaser, such as the Defendants.

The summary judgment record thus establishes as a matter of law that Defendants "directly, or indirectly through one or more intermediaries, control[ed] or [were] controlled by, or [were] under common control with" the Purchasers of the APA. Consequently, Defendants are Affiliates pursuant to the APA and are entitled to bring an indemnity claim against Mr. Kelly.

2. Breach of APA Warranty or Representation

To bring a claim for indemnification under the APA, there must be a breach of a warranty or representation.

Defendants contend Mr. Kelly's alleged $1 million oral signing bonus deal (which would have required disclosure in the APA) was not disclosed in the APA or anywhere else.  As a result, by the allegations in his complaint (and subsequent testimony under oath), Mr. Kelly admitted breach of the warranties in Sections 2.1 and 3.23(f) of the APA because he purported to be in the position — when he signed the APA — of having an undisclosed, oral side-deal with Riverside to be paid a $1 million signing bonus upon closing of the APA.

Defendants contended that Mr. Kelly's breaches of Sections 2.1 and 3.23(f) of the APA, evidenced by the admissions in his pleadings, were both intentional and fraudulent.  Defendants

27

thus contended that their indemnity counterclaim constituted a complete defense to Mr. Kelly's claims, regardless of their merit.

Under APA Section 2.1, Mr. Kelly, as a Seller, agreed to a warranty that "[t]he execution, delivery and performance of this [APA] . . . w[ould] not . . . be in conflict with . . . or cause the acceleration of any obligation or loss of any agreement [or] contract . . . to which the Seller is a party . . . ."  He also agreed to a warranty under Section 3.23(f) that "[t]he consummation of the Transactions contemplated by this [APA] will not . . . (iii) increase the amount of compensation or benefits due to any individual."

Mr. Kelly's admitted side-deal breached these explicit warranties.  Mr. Kelly's belief, at the time he entered into the APA, was indisputably that he would be entitled to a $1 million signing bonus upon the consummation of the TelJet transaction because of the oral contract he had with Riverside.  Such a side-deal conflicted with Section 2.1 because the consummation of the TelJet transaction and the APA "cause[d] the acceleration" of Riverside's purported obligation to pay Mr. Kelly the $1 million signing bonus.

The side-deal also conflicted with Section 3.23(f) because the $1 million signing bonus must be deemed "compensation or benefits."  According to Black's Law Dictionary, compensation is

"[r]emuneration and other benefits received in return for services rendered." *Compensation*, Black's Law Dictionary (10th ed. 2014).  Benefits is defined as "[p]rofit or gain." *Benefit*, Black's Law Dictionary (10th ed. 2014).  There is no dispute that the alleged $1 million signing bonus, if received, would be remuneration, profit, or gain for Mr. Kelly.

As a further matter, Mr. Kelly's suggestion that Riverside and Mr. Kaplan knew of his alleged side-deal did not abrogate the warranties in the APA or preclude the Defendants' indemnity counterclaim.  Delaware law follows the majority rule that a party cannot defend against a claim of breach of warranty by contending that the plaintiff knew of the breach pre-closing. *See Gloucester Holding Corp*. v. *U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 127-28 (Del. Ch. 2003) ("Reliance is not an element of claim for indemnification."); *Akorn, Inc*. v. *Fresenius Kabi AG*, No. CV 2018-0300-JTL, 2018 WL 4719347, at *76 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018). Additionally, Section 9.8 of the APA expressly stated that "[t]he rights to indemnification . . . shall not be affected by (a) any investigation or finding by or on behalf of any party or any knowledge acquired by any party, whether before or after the date of this Agreement of the Closing Date . . . ."  Therefore, Mr. Kelly cannot avoid indemnity for his breaches of warranty by suggesting Defendants had knowledge of the alleged side-deal

because that would be irrelevant under both the Delaware law and the parties' written agreement.

### 3.   Prerequisite Losses for Indemnification

Mr. Kelly contended he was entitled to summary judgment on the indemnification counterclaim because Defendants had not incurred losses and thus were not entitled to indemnification.

In order to be eligible for indemnification under the APA, pursuant to Section 9.3, the aggregate claims ordinarily must exceed $50,000.  However, the $50,000 threshold does not apply for "claims based upon fraud or for breach of the Uncapped Representations," the latter term being defined as representations and warranties contained in Article 2 and other enumerated sections.

Mr. Kaplan testified that he had not paid any monies or otherwise incurred any legal expenses as a result of Mr. Kelly commencing this action.  Riverside, however, contended that it had paid $250,000 in attorneys' fees and costs to satisfy its insurance deductible.

Here, Defendant Riverside's indemnity claim falls within the exception to the $50,000 limitation in Section 9.3 because they are claims based on Article 2 and upon fraud (since Mr. Kelly believed when he signed these warranties that he had an unwritten and inconsistent side-deal for $1 million).

4.   Time Bar on Indemnification Claims

Mr. Kelly also contended he was entitled to summary judgment on the basis that Defendants' indemnity counterclaim was time-barred.

Section 9.1 of the APA provides, in relevant part, that "[n]o action for a breach of the representations and warranties contained herein shall be brought more than eighteen months following the Closing Date, except for" claims arising out of "the representation and warranties contained in Article 2" and "claims based upon fraud", which shall survive indefinitely.

I have found Riverside's indemnity claim arises from Article 2 and is independently based on fraud.  Thus, they are not time barred.

Mr. Kelly urged me to reject as improper Riverside's attempt to circumvent the survival clause by phrasing their breach of warranty claim as fraud.  For this proposition, Mr. Kelly cites to *Microstrategy Inc.* v. *Acacia Research Corp.*, where the court noted "Delaware law holds that a plaintiff cannot bootstrap a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." No. 5735-VCP, 2010 WL 5550455, at *17 (Del. Ch. Dec. 30, 2010) (internal quotation marks omitted). However, the *Microstrategy* approach is inapplicable here where Riverside did not plead a separate fraud claim.  Instead,

Riverside's indemnity claim is based upon breaches of APA warranties by means of fraud and therefore qualify as breach of contract "claims based upon fraud".

As a consequence, I concluded Riverside's indemnity claims were not time-barred either as based on Article 2 warranties and representations on fraudulent breach of those warranties.

### 5.   The Settlement Agreement

Mr. Kelly argued he was entitled summary judgment because the indemnity counterclaim was released by the July 2014 settlement agreement that releases the TelJet Parties and their affiliates, officers, and directors, including him.

However, neither Riverside nor Mr. Kaplan were parties to the settlement agreement.  Moreover, they are not "subsidiaries, predecessors, successors and assigns" of the Tech Valley Parties.  Notably, the settlement agreement does not bind Tech Valley "affiliates."[3]  Therefore, the settlement agreement did not bind the Defendants.[4]

---

[3]  This is in contrast with Section IV.B. which binds "TelJet Parties" and their "subsidiaries, predecessors, successors, *affiliates*, trustees, administrators, executors, heirs, family members, attorneys, assigns and insurers" (emphasis added).
[4]  The fact that there is a later Section titled "MISCELLANEOUS" that says "[t]his agreement shall be binding upon and shall insure to the benefit of each Party, its successors, assigns, affiliates, agents, officers, directors, and representatives" is immaterial.  That general Section does not override the specific language of Section IV.A — language that does not include affiliates of the Tech Valley Parties — that designates with particularity the parties bound by the settlement agreement.

Moreover, even if Defendants were bound by the settlement agreement, they would be saved by Section IV.D.  Section IV.D provides that insofar as the releases and covenants not to sue "extend to or otherwise include persons who are current or former employees of any of the Tech Valley Parties" such releases and covenants extend only to "affirmative claims made by any Party relating to and/or arising out of the APA," and "shall not prevent any Party from asserting defenses or counterclaims relating to and/or arising out of the APA against any current or former employees of any of the Tech Valley Parties in the event any such person first commences a lawsuit . . . ."  The indemnity counterclaim fell squarely within this savings clause.  It is not an affirmative claim; instead, it is a counterclaim "relating to and/or arising out of the APA" against a former employee of Tech Valley Parties, Mr. Kelly, deriving from a lawsuit initiated by Mr. Kelly against the Defendants.

Consequently, the settlement agreement does not bind Defendants and, even if it did, it would not bar Defendants' indemnity counterclaim because of Section IV D.

---

To give effect to the general would otherwise be to ride roughshod over the specific.  *See DCV Holdings, Inc.* v. *ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.")

Necessarily, in addition to permitting Defendants'
counterclaim for indemnification, these conclusions also mean
that the Defendants are entitled to summary judgment regarding
Mr. Kelly's counterclaim for breach of the settlement agreement.

### 6.   Ripeness of the Indemnity Counterclaim

Mr. Kelly argued that Defendants' counterclaims were not
ripe because, under Delaware law, indemnification claims do not
accrue until an underlying breach is established.

"The test to be applied in ripeness analysis is whether
there is a substantial controversy, between parties having
adverse legal interests, of sufficient immediacy and reality
. . . ."  *McInnis-Misenor* v. *Me. Med. Ctr.,* 319 F.3d 63, 70 (1st
Cir. 2003) (quoting *Lake Carriers' Ass'n* v. *MacMullan,* 406 U.S.
498, 506 (1972)) (internal quotation marks omitted).  This
determination "involves a dual inquiry: evaluation of 'both the
fitness of the issues for judicial decision and the hardship to
the parties of withholding court consideration.'"  *Id.* (quoting
*Abbott Labs.* v. *Gardner,* 387 U.S. 136, 148 (1967)).  "The
fitness inquiry 'typically involves subsidiary queries
concerning finality, definiteness, and the extent to which
resolution of the challenge depends on facts that may not yet be
sufficiently developed.'"  *Id.* (quoting *Stern* v. *U.S. Dist.
Court,* 214 F.3d 4, 10 (1st Cir. 2000)).  "The hardship prong
evaluates 'the extent to which withholding judgment will impose

34

hardship—an inquiry that typically turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties.'"  *Id.* (quoting *Stern,* 214 F.3d at 10).

Purporting to rely on Delaware case law, Mr. Kelly cites *LaPoint* v. *AmerisourceBergen Corp.,* 970 A.2d 185 (Del. 2009), for the proposition that "[a]s a general rule, decisions about indemnity should be postponed until the underlying liability has been established because a declaration as to the duty to indemnify may have no real-world impact if no liability arises in the underlying litigation." *Id.* at 197.  The *LaPoint* court also noted that this is a "general rule" and not "absolute." *Id.*  Mr. Kelly's reliance on Delaware state case law for an inquiry concerning this court's subject matter jurisdiction is misplaced.

The Seventh Circuit in *Bankers Trust Co.* v. *Old Republic Ins. Co.*, 959 F.2d 677 (7th Cir. 1992), "considered the following factors to determine whether the duty to indemnify claim was ripe: the likelihood that the insured would be liable in the underlying litigation; the high amount of damages for which the insured was likely to be liable; the insured's inability to pay those damages if found liable; the likelihood that no other insurance policy would cover the damages." *Molex Inc.* v. *Wyler*, 334 F. Supp. 2d 1083, 1087 (N.D. Ill. 2004). "Because the court [in *Bankers Trust*] found a high likelihood

that the insured would be held liable in the underlying action
for an amount that the insured could not afford to cover, the
Seventh Circuit found that the harm was sufficiently probable to
allow a declaratory judgment on the duty to indemnify before the
question of the insured's liability was resolved." *Id.* That is
the case here.

The indemnity counterclaim is a complete defense against
Mr. Kelly's underlying claims; Mr. Kelly's claims cannot prevail
without a demonstration he breached his warranties. If Mr.
Kelly were to lose on his claim, he remained obligated to
Defendants for damages in the nature of attorneys' fees and
costs. Therefore, notwithstanding any determination as to the
existence of Mr. Kelly's alleged $1 million oral contract with
Defendants, the Defendants' indemnity claims are appropriate.

### D. *Defendants' Motion for Summary Judgment on Plaintiff's Claims*

Further, the Defendants seek summary judgment against all
of Plaintiff's claims, namely (i) breach of contract by
Riverside; (ii) fraud by Riverside and Mr. Kaplan; (iii) quantum
meruit from Riverside; (iv) promissory estoppel by Riverside;
(v) unfair or deceptive acts or practices by Riverside; (vi)
aiding and abetting fraud by Mr. Kaplan; and (vii) civil
conspiracy by Mr. Kaplan.

The Defendants' indemnity counterclaims are a complete defense to all such claims.  This is because Mr. Kelly cannot be successful on his claims without having breached his own warranties and thus owing indemnity for the same amounts.  As a result, the Defendants are entitled to summary judgment as to all of these claims.  Ultimately, the dispute between the parties turned on indemnification.  Having found Mr. Kelly liable for indemnification, I turn to the damages question.

## IV. INDEMNIFICATION DAMAGES

Under Section, 9.4 of the APA, Defendants are entitled to be indemnified and held harmless against "all claims, liabilities, obligations, costs, damages, losses and expenses (including reasonable attorneys fees and costs of investigation) of any nature."  Having found Defendants are entitled to summary judgment on their counterclaim for indemnification, I must determine the quantum of damages payable by Mr. Kelly.  As noted, only Riverside has established actual damages.

### A.   *Legal Fees in Dispute*

While Riverside incurred over $900,000 in legal fees and costs, it seeks damages to cover lawyers' fees and costs only up to the $250,000 insurance deductible.[5]

---

[5]   Section 9.10 of the APA states that "[t]he amount of any Losses for which indemnification . . . shall be net of any amounts actually recovered under insurance policies . . . ."

The fees and costs in dispute were rendered between August 2016 and July 2017 by Defendants' counsel, Daniel Winston and John Calhoun of Choate, Hall & Stewart LLP ("Choate").   During this time period, Choate and its database provider billed $1,081,697.19, and the insurer subsequently approved $919,103. The insurer paid the approved amount, net of the $250,000 deductible that Riverside had already paid.

On March 24, 2017, and April 25, 2017, Riverside made unreimbursed payments respectively of $20,815.57 and $3,766.86 directly to OpenText (third-party database provider for discovery management).[6]

On May 18, 2017, Riverside made a further payment of 225,417.57 to Choate for their legal services and costs.

In light of the fact Riverside expended $250,000 before reaching their deductible, I hold Riverside's payment of $225,417.57 to Choate is apportionable to the first $225,417.57 of approved legal services rendered by Choate.   According to the evidence submitted, Choate invoiced the following approved amount of legal services for the following periods before the May 18, 2017 payment was made:

---

Riverside's insurer has paid Riverside's attorneys' fees for fees incurred above the deductible.

[6]  Mr. Kelly does not appear to dispute these sums paid to OpenText, the third-party database provider.

- September 1, 2016, to October 31, 2016 (Invoice 1575771) - $85,287.00

- November 1, 2016, to November 30, 2016 (Invoice 1580773) - $8,482.50

- December 1, 2016, to December 29, 2016 (Invoice 1583590) - 56,441.00

- January 3, 2017, to February 28, 2017 (Invoice 1587896) - $210,982.51

Thus, I treat Riverside's May 18, 2017 payment of $225,417.57 to Choate as reflecting the services rendered in the first three invoices (which total $150,210.50) in their entireties and up to $75,207.07 from the services referenced in the fourth invoice as together constituting the legal fees and costs of the deductible paid directly to Choate.  Based on my analysis of the insurer's audit report and the underlying billing data provided by Choate, I find this deductible apportionment extends through line item entry 36 for services rendered on January 25, 2017.  I will not consider the legal services rendered after January 25, 2017 because — the deductible having been reached — they were not paid by Riverside, but rather the insurer.

Mr. Kelly disputes whether the lawyers' fees and costs claimed by Riverside are "reasonable".

Under Delaware law, where attorneys' fees are owed pursuant to a contract, a court must independently evaluate the reasonableness of the fees sought using the relevant factors set forth in the Delaware Professional Conduct Rules, Rule 1.5(a). *Council of Wilmington Condo.* v. *Wilmington Ave. Assocs.*, L.P, No. CIV.A.94C-09-004, 1999 WL 1223792, at *3 (Del. Super. Ct. Nov. 3, 1999) (citing *General Motors Corp.* v. *Cox*, 304 A.2d 55, 57 (Del. 1973)); *PVI, Inc.* v. *Ratiopharm GmbH*, 253 F.3d 320, 330 (8th Cir. 2001) (applying Delaware law).  The factors include: the time, labor, and skill required; the novelty and difficulty of claim; the fees customarily charged in locality; the amount involved and results obtained; the experience, reputation, and ability of the lawyer or lawyers performing the services.  *See* DELAWARE PROFESSIONAL CONDUCT RULES, Rule 1.5(a).

I reject Riverside's categorical contention that having incurred over $900,000 in legal fees and costs, the fact they are merely seeking $250,000 (their deductible) means their fees are *per se* reasonable.  Instead, I analyze the legal services and costs actually paid by Riverside in light of the Professional Conduct Rules factors to assess reasonableness.

First, as to the hourly rate charged, Mr. Kelly takes issue with the rate charged by Riverside's counsel and claims it was excessive.  Two attorneys primarily worked on the case for the Defendants: Mr. Winston, a partner at Choate, had rates of $950

per hour (for period until January 2017) and $1,020 per hour (in and after January 2017); and Mr. Calhoun, an associate, had rates of $425 per hour (for period until January 2017) and $550 per hour (in and after January 2017).[7]  In light of the education, experience, and ability of Mr. Winston and Mr. Calhoun, and my knowledge of the customary market rates for large commercial law firms in the Boston area during this time period, I find the hourly rates charged by Choate to be reasonable.

Secondly, Mr. Kelly argues that Riverside is only entitled to recover legal fees for claims as to which it is entitled to indemnification.  Mr. Kelly re-asserts that the Defendants' claims under Article 3 of the APA are time barred and therefore any attorneys' fees attributable to those claims are not indemnifiable.  This argument was addressed above and rejected. *See supra* Section III.C.4.

Third, I turn to certain of the specific time-entries objected to by Mr. Kelly.  I pause to note that Riverside's legal fees have been audited by Riverside's insurer; pursuant to this audit, certain time entries were objected to and resulted in a reduction in legal fees.  The fact that a third-party insurer, with an incentive to limit fees, has audited the

---

[7] Another attorney, Jean Paul Jaillet, spent 30.9 hours on the matter, and a paralegal also worked on the case.

invoices, made specific objections, and ultimately paid the fees gives support to a finding of reasonableness.

Specifically, Mr. Kelly objects to the amount of time Defendants' counsel spent preparing for Mr. Kelly's deposition. However, this preparation occurred after January 25, 2017 and is therefore not relevant to the services I am considering under the deductible apportionment.

Additionally, Mr. Kelly objects to Defense counsel spending 14.2 hours on preparing, researching, and conferring with opposing counsel and their client for the Local Rule 16.1 Joint Statement filed on December 5, 2016. Considering the research and strategy that goes into identifying and refining schedule issues of the character dealt with in the Joint Statement in a case with dimensions like this, I am satisfied after reviewing the pertinent time entries that the hours expended were reasonable.

Mr. Kelly also takes issue with the fact that Defendants' counsel spent approximately 66.9 hours on the motion to dismiss I denied on December 13, 2016. Considering the number of causes of action that Mr. Kelly asserted in his Complaint, and the complexity of the issues that consequently needed to be researched and addressed, I do not find the hours billed to be unreasonable. Nor do I find the eventual denial of the motion to dismiss to be determinative; Defendants were entitled —

indeed duly bound — to defend themselves vigorously at all
stages of dispositive motion practice, so long as their
submissions were not frivolous or otherwise without colorable
merit.  The Defendants' litigation activity did not fall in that
category.  Moreover, the early research plainly became helpful
when reframed in the successful summary judgment context which
this Memorandum addresses.

In conclusion, I find that Riverside is entitled to the
$250,000 it has expended on reasonable attorneys' fees and
costs.

## B.    *Pre-judgment Interest*

Under Delaware law, awarding pre-judgment interest is
within the Court's discretion.  *Stonington Partners, Inc.* v.
*Lernout & Hauspie Speech Prod.*, N.V., No. CIV.A. 18524-NC, 2003
WL 21555325, at *5 (Del. Ch. July 8, 2003*), judgment entered sub
nom. Stonington Partners, Inc. et al.*, v. *Lernout & Hauspie
Speech Products, N.V.*, (Del. Ch. 2003), *aff'd in part, rev'd in
part sub nom. Hauspie* v. *Stonington* Partners, Inc., 945 A.2d 584
(Del. 2008).  The legal interest rate under Delaware law for
pre-judgment interest is the Federal Discount Rate plus 5%.  *See*
6 Del. C. § 2301.  Here, I exercise my discretion to award pre-
judgment interest on the $250,000 Mr. Kelly caused Defendants to
incur as costs, to begin running respectively as to each of the
separate payments aggregated to meet the deductible.  This award

of the time value of money paid out is necessary to make Riverside whole by putting it in the same position it would have been in if it had not been forced to divert funds to payment of the deductible.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment was granted and Plaintiff's motion for summary judgment and motion to strike were denied.

On the basis of further submissions thereafter, the Clerk is now directed to enter judgment for Riverside in the amount of $250,000, with pre-judgment interest as to: $20,815.57 to run from March 24, 2017, $3,766.86 to run from April 25, 2017, and $225,417.57 to run from May 18, 2017.  Post-judgment interest shall be in accordance with 28 U.S.C. § 1961.

/s/ Douglas P. Woodlock_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE