# United States Court of Appeals
## For the First Circuit

─────────────

No. 19-1856

GREGORY KELLY,

Plaintiff, Appellant,

v.

RIVERSIDE PARTNERS, LLC, a Massachusetts Corporation;
STEVEN F. KAPLAN, individually,

Defendants, Appellees.

─────────────

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

─────────────

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

─────────────

Colin R. Hagan and Shlansky Law Group, LLP on brief for
appellant.
Daniel C. Winston, John C. Calhoun, and Choate, Hall & Stewart
LLP on brief for appellees.

─────────────

July 6, 2020

─────────────

LYNCH, **Circuit Judge**.  Plaintiff Gregory Kelly was the President of TelJet Longhaul, LLC ("TelJet"), a company that defendant Riverside Partners, LLC ("Riverside") sought and successfully directed one of its portfolio companies to acquire. Defendant Steven Kaplan was a General Partner at Riverside.  A General Partner at Riverside is an employee, not an equity owner or managing member.  In the face of considerable documentation of the acquisition, Kelly brought suit in federal court alleging that he had an oral side agreement under which Kaplan and Riverside ("the defendants") would pay Kelly $1 million if the portfolio company acquired TelJet.  Then the defendants did not pay him after the acquisition occurred.

In response to Kelly's breach-of-contract claim, the defendants denied any such side deal existed.  They also counterclaimed for indemnification for breach of certain representations and warranties Kelly had made.  After discovery, the district court entered summary judgment for defendants, not reaching the issue of whether such an oral side agreement existed, and holding that regardless Kelly was in breach of his warranties and representations and awarded the defendants attorneys' fees of $250,000 and interest.  Kelly appealed.

We take the case as presented to us, including the waiver of arguments by Kelly.  On that basis, we affirm.

I.

A.   <u>Facts</u>

    1.   <u>The Relevant Parties and Entities</u>

In fall 2010, Riverside, a Boston-headquartered private equity firm, identified TelJet[1] as a potential acquisition for its portfolio company Tech Valley Holdings, LLC ("Tech Valley"). Vermont Fiberlink, LLC and TelJet, Inc. owned and were the members of TelJet.  Tech Valley wholly owned TVC Albany, Inc. ("TVC"). TVC was the sole member of and exclusively managed TJL Acquisition Company, LLC ("TJL Acquisition").  TVC created TJL Acquisition specifically to acquire TelJet with it.

Riverside employees controlled the Board of Managers of Tech Valley and the Board of Directors of TVC.  Kaplan was the Chairman of both these Boards.  He also had the authority to sign agreements for TJL Acquisition in which he exercised TJL Acquisition's rights, powers, and privileges as to both the Asset Purchase Agreement ("APA"), the contract which outlined the terms of the purchase of TelJet, and the TelJet transaction ("the Transaction") itself.

    2.   <u>The TelJet Transaction and Execution of the APA</u>

In 2011, Ian Blasco, a Riverside General Partner, and Kaplan met with Kelly, then the President of TelJet, and the owners

---

[1]   TelJet provided a fiber optic communications network and telecommunications services.

of TelJet's parent companies to discuss investing in TelJet. Blasco and Kaplan also met with Kelly to discuss the possible acquisition of TelJet by Tech Valley and Kelly's post-acquisition role. Kelly later testified that, during one of these discussions, "Kaplan offered [him] a million dollars to guide the sale . . . [payable] if [Tech Valley was] the successful winner to acquire the company." Kelly alleges that Kaplan offered this sum on behalf of Riverside, which would supply the payment.

On December 14, 2012, Kelly, other TelJet officers, and TelJet shareholders executed a Letter of Intent ("the Letter") with Kaplan and Riverside. The Letter outlined non-binding terms of Tech Valley's acquisition of TelJet. TVC was designated as the bidding entity for the acquisition. The Letter was signed by Kaplan and addressed as being from Riverside (on behalf of Tech Valley).

On March 27, 2013, Kelly, Kaplan, and TelJet shareholders signed the APA, which sold TelJet's assets to Tech Valley and TVC. The Transaction closed on June 28, 2013. After the closing, Kelly began work for TVC pursuant to the APA.

On August 22, 2014, Kelly resigned from TVC. On September 12, 2014, he rejected a separation agreement from TVC and did not release any claims.

3. The APA Parties and Affiliates

The parties to the APA were defined as the "Selling Entities," the "Sellers," the "Purchaser," and the "Parent." The Selling Entities were TelJet; Vermont Fiberlink, LLC; and TelJet, Inc. The Sellers were Kelly and three individuals, Scott Pidgeon, Kenneth Pidgeon, and Alan Pidgeon, who were TelJet shareholders and owners of Vermont Fiberlink, LLC.

The APA originally defined "Purchaser" as TJL Acquisition, a wholly owned subsidiary of TVC. TVC, TelJet, and TelJet Inc. executed an Amendment to the APA, which assigned the rights and obligations of TJL Acquisition to TVC and defined the "Purchaser" as TVC alone. Kelly, Kaplan, and Kenneth Pidgeon signed this agreement. The APA defined the "Parent" as Tech Valley.

The APA defined "Affiliates" using the definition in Rule 405 of the Securities Act of 1933, as amended: that is, "a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with [a party to the APA]." 17 C.F.R. § 230.405. Rule 405 further defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Id.

4.   <u>The APA Representations and Warranties</u>

Article 2 of the APA contains certain representations and warranties of the Sellers.  It states in the relevant part:

> The execution, delivery and performance of this Agreement and the other agreements . . . will not result in any violation of, be in conflict with, constitute a default under, or cause the acceleration of any obligation or loss of any rights under any Legal Requirement, agreement, contract, [or] instrument . . . to which the Seller is a party or by which the Seller is bound.

Article 3 contains additional warranties of the Sellers and Selling Entities.  This includes Section 3.23(f), which states: "The consummation of the Transactions contemplated by this Agreement will not . . . increase the amount of compensation or benefits due to any individual."

5.   <u>The APA Indemnification, Choice of Law, and Forum Selection Provisions</u>

Article 9 contains the APA's indemnification provisions. Section 9.1 provides for an eighteen-month survival period for "action[s] for a breach of the representations and warranties contained [in the APA]," except for claims arising out of Article 2 (and several other irrelevant provisions), "which shall survive indefinitely after the Closing."  Section 9.4 provides that the Sellers will severally indemnify the Purchaser and its Affiliates "against all Losses arising out of or relating to . . . any breach or violation of the representations or warranties of such Seller

- 6 -

in ARTICLE 2" and provides that the Selling Entities and Sellers will jointly and severally indemnify the Purchaser and its Affiliates against all losses arising out of or relating to the breach or violation of other representations or warranties.  The APA defines "Losses" as "claims, liabilities, obligations, costs, damages, losses and expenses (including reasonable attorneys' fees and costs of investigation) of any nature."

Section 9.3 requires that claims for indemnification exceed $50,000 and caps the maximum recovery.  But the section also provides that "claims based upon fraud or for breach of the Uncapped Representations [i.e., the representations and warranties contained in Article 2] shall not be subject to [these] limits."[2]

Article 10 states that the APA "shall be governed by and construed in accordance with the internal laws of the State of Delaware" and "[a]ny judicial proceeding arising out of or relating to [the APA] shall be brought in the courts of the State of Delaware."

---

[2]     On October 8, 2013, Tech Valley and TVC gave Notice of Claims for Indemnification against TelJet; Vermont FiberLink, LLC; and the Pidgeons (the "TelJet Parties").  These parties settled this claim on July 31, 2014.  Tech Valley and TVC, "on behalf of themselves and each of their respective subsidiaries, predecessors, successors and assigns," released any additional claims against the TelJet Parties and their "shareholders, equity holders, . . . managers, [and] officers," among others.

B.    Procedural History

On August 19, 2016, Kelly brought suit in Massachusetts federal court against Kaplan and Riverside for (1) breach of contract against Riverside; (2) fraud against both defendants; (3) quantum meruit against Riverside; (4) promissory estoppel against Riverside; (5) unfair or deceptive acts or practices against Riverside; (6) aiding and abetting fraud against Kaplan; and (7) civil conspiracy by concerted action against Kaplan.

On January 27, 2017, Riverside and Kaplan brought a counterclaim for indemnification under Article 9 of the APA against Kelly.    In response, on February 17, 2017, Kelly brought a counterclaim for breach of the July 31, 2014 settlement agreement.

On August 24, 2017, the defendants moved for summary judgment on all claims and counterclaims, and Kelly moved for summary judgment on the defendants' counterclaim.

On December 19, 2017, the district court granted summary judgment in favor of Riverside and Kaplan on all claims and on the counterclaims.[3]    It also requested further briefing on damages. On February 28, 2018, the district court held a hearing on damages and requested further briefing on attorneys' fees.

On July 25, 2019, the district court issued a Memorandum and Order, in which the court outlined its reasoning and awarded

---

[3]    The court also denied a motion to strike that Kelly had brought earlier, but Kelly does not challenge this on appeal.

- 8 -

damages of $250,000 (as well as pre- and post-judgment interest) to Riverside.

First, the court held that Kelly had waived enforcement of the APA's forum selection clause by bringing suit in Massachusetts, and dismissing the counterclaim would be "unreasonable and unjust . . . since the full course of discovery and several rounds of motion practice ha[d] proceeded in [the district] court."

Next, the district court concluded that Kaplan and Riverside were Affiliates of the Purchaser, and so could bring indemnification claims under the APA. The court concluded that (1) Kaplan and Riverside controlled TVC and TJL Acquisition, and (2) Kaplan, Riverside, TVC, and TJL Acquisition were under the common control of David Belluck, Riverside's sole equity owner and managing member.

The district court concluded that the existence of Kelly's "undisclosed, oral side-deal with Riverside to be paid a $1 million signing bonus" would breach Article 2 (Section 2.1) and Article 3 (Section 3.23(f)). The court stated that the side-deal "conflicted with" the warranty in Section 2.1 against the APA "caus[ing] the acceleration" of any obligation and the warranty in Section 3.23(f) that the APA would not "increase the amount of compensation or benefits due to any individual."

The district court then held that the counterclaim for indemnification was based on breaches of Articles 2 and 3, and that each breach was based on fraud. Because a claim based on a breach of Article 2 or based on fraud is excepted from the indemnification and survival limits, the district court rejected Kelly's arguments that the indemnification counterclaim should be dismissed for not reaching the $50,000 indemnification threshold and for being time-barred.

The district court then concluded the counterclaim was ripe. The court found the harm to Kaplan and Riverside "sufficiently probable to allow a declaratory judgment on the duty to indemnify before the question of [their] liability was resolved."

The district court held that the indemnification counterclaim served as a complete defense to all of Kelly's claims and that he would owe attorneys' fees to the defendants.[4]

Finally, the district court calculated damages. Although Riverside incurred over $900,000 in attorneys' fees and costs, it paid $250,000 (the deductible under its insurance policy).[5] The district court concluded that the APA limited Losses

---

[4] The district court also concluded that the previous settlement agreement and release of claims did not apply to the defendants and the indemnification counterclaim. Kelly does not challenge this on appeal.

[5] Riverside paid for Kaplan's attorneys' fees.

(as the term is defined in the APA) by the amount recovered under insurance policies and that Riverside's attorneys' fees were reasonable.  The court awarded $250,000 to the defendants as well as pre- and post-judgment interest.

On August 23, 2019, Kelly timely appealed.

II.

A.    Standard of Review

We review the district court's grant of summary judgment de novo.  Hightower v. City of Boston, 693 F.3d 61, 70 (1st Cir. 2012).  Because the parties filed cross-motions for summary judgment, we "'view each motion, separately,' in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."  OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012) (quoting Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010)).

B.    Kelly Waived Enforcement of the Forum Selection Clause by Bringing Suit in Massachusetts

Kelly argues that the defendants' indemnification counterclaim should be dismissed under the APA's forum selection clause.  Kelly contends that he did not waive the clause by filing in Massachusetts.  We disagree.

Delaware law applies to interpreting the APA's forum selection clause.  See FPE Found. v. Cohen, 801 F.3d 25, 32 (1st

- 11 -

Cir. 2015) (applying the governing state contract law to interpret a forum selection clause). Delaware law requires that a court interpret broadly the phrase "arising under or relating to." <u>ASDC Holdings, LLC</u> v. <u>Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.</u>, C.A. No. 6562-VCP, 2011 WL 4552508, at *5 (Del. Ch. Sept. 14, 2011) (unpublished). "[A]ny issues that '<u>touch on</u> contract rights or contract performance' should be subject to the exclusive jurisdiction agreed to under that clause." <u>Id.</u> (quoting <u>Parfi Holdings AB</u> v. <u>Mirror Image Internet, Inc.</u>, 817 A.2d 149, 155 (Del. 2002)).

Kelly's breach-of-contract claim clearly relates to the APA. It touches on both rights to indemnification in the APA and the performance of the APA. The defendants' indemnification, estoppel, and waiver defenses all relate to contractual rights in the APA. Kelly's entire claim relies on the performance of the APA: he could not bring a claim for breach of contract without performing the side agreement, i.e., completing the Transaction and performing the APA. <u>See</u> <u>Huffington</u> v. <u>T.C. Grp., LLC</u>, 637 F.3d 18, 22 (1st Cir. 2011) (holding that a forum selection clause in a subscription agreement covered claims arising from misrepresentations about a "purchase [that] could not have been made without the agreement").

Kelly brought suit in Massachusetts, and that constituted waiver. <u>See</u> <u>FPE Found.</u>, 801 F.3d at 29 (stating that

a party may waive "through its conduct" a right to arbitrate); see also Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause . . . ."). His argument to us that he would be excused from that waiver under Delaware law was not presented to the district court and so cannot be raised for the first time on appeal. Arrieta-Gimenez v. Arrieta-Negron, 859 F.2d 1033, 1037 (1st Cir. 1988).

C.   Riverside and Kaplan Were Affiliates of the Purchaser(s)

Kelly argues that Riverside and Kaplan lack standing to bring an indemnification claim because they are not Affiliates of the Purchaser, TJL Acquisition.[6]  Although there is some dispute about whether the Purchaser subject to the analysis is TJL Acquisition, or its parent company TVC, this is immaterial: TVC wholly owns and controls TJL Acquisition, so the Affiliates of TVC are also the Affiliates of TJL Acquisition.  In consequence, we need not decide whether TJL Acquisition or TVC was the Purchaser.

The defendants directly controlled TJL Acquisition and TVC.  Kaplan was the Chairman of the Board of both TVC and Tech Valley and "at all times orchestrated and controlled the decisions of those companies as to whether and on what terms to sign the APA, purchase the TelJet assets, and enter into employment terms

---

[6]    Kelly and the defendants agree that Riverside and Kaplan were not parties to the APA.

- 13 -

with Mr. Kelly."  "Kaplan . . . was specifically authorized to sign agreements for TJL Acquisition exercising all of TJL Acquisition's rights, powers, and privileges with respect to the APA and the TelJet transaction."  Indeed, Kaplan signed the APA on behalf of both Tech Valley and TJL Acquisition.  This degree of control over TJL Acquisition and TVC, especially over the Transaction at issue, clearly shows Kaplan was an Affiliate.  <u>See SEC</u> v. <u>Platforms Wireless Int'l Corp.</u>, 617 F.3d 1072, 1088 (9th Cir. 2010) ("[T]he explicit power to direct the specific share transfers at issue establishes control . . . .").  Kaplan averred under oath that "Riverside through its employees thereby controlled the Board and company decisions of both Tech Valley and TVC" and "controlled and orchestrated the negotiation of the terms of the APA and TelJet transaction on behalf of Tech Valley, TVC and TJL Acquisition."

Further, Tech Valley's LLC Agreement states that Tech Valley is "exclusively" managed by its Board.  Its Board is comprised of Managers, and any Manager who is also an employee of Riverside is defined as a "Riverside Manager."  The LLC Agreement states that, even if the Riverside Managers comprise less than a majority of Tech Valley's Board, they "shall be deemed to have a sufficient number of votes to constitute a majority of the Board."[7]

_____

[7]    Kelly's argument that the LLC Agreement limits these Managers to take only certain actions relies on a misreading of

Kelly argues that this evidence is insufficient to show control.[8]  But he offers conclusory assertions, misstatements of the record, and irrelevant arguments that fail to challenge Kaplan's testimony or the control shown by the LLC Agreement.  An entity need not have complete and exclusive control over another entity to control it under Rule 405; "multiple persons can exercise control simultaneously."  Id.[9]

D.   The Defendants' Indemnification Claim is Ripe

Kelly argues that the defendants' indemnification claim is not ripe because the underlying dispute has not been resolved. Not so.

The ripeness of indemnification claims is a question of federal law.  See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363

---

the Agreement and so is meritless.

[8]   Kelly also makes a meritless argument that, because there was an unsigned signature block on the Assignment Agreement for TJL Acquisition, TJL Acquisition never assigned its rights and obligations in the APA to TVC.  So, Kelly contends, because TJL Acquisition dissolved before Kelly filed the complaint and TVC never acquired any rights, the defendants were not Affiliates of TJL Acquisition at the appropriate time.  But this would mean that TVC never purchased TelJet, which no party has ever asserted and would preclude Kelly's alleged entitlement to the $1 million payment.  Kelly has not sufficiently developed this argument to address this contradiction, and so he has waived it.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[9]   Because the defendants have shown that they directly controlled TJL Acquisition and TVC, we need not address whether these parties and entities were under the common control of Belluck.

(1st Cir. 2001).  To determine ripeness, we look to "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).  Under the Bankers Trust test, we determine whether these prongs are met by looking to the likelihood indemnification liability would exist, whether the damages would be high, the liable party's ability to pay, and the likelihood another insurance policy would cover the damages. Bankers Tr. Co. v. Old Republic Ins. Co., 959 F.2d 677, 680-82 (7th Cir. 1992); see also Molex Inc. v. Wyler, 334 F. Supp. 2d 1083, 1087 (N.D. Ill. 2004).

Kelly does not challenge the Bankers Trust analysis on the merits, and instead erroneously argues that Delaware law governs this issue.[10]  He has waived any argument as to ripeness under the applicable federal law.  See Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983).

---

[10]     Further, the Delaware law to which he cites does not necessarily bar indemnification suits before the underlying action is decided.  See, e.g., Ladenburg Thalmann Fin. Servs., Inc. v. Ameriprise Fin., Inc., C.A. No. N16C-05-086 WCC CCLD, 2017 WL 685577, at *8 (Del. Super. Ct. Jan. 30, 2017) (unpublished) ("In the context of indemnification, claims will 'not typically ripen until after the merits of an action have been decided . . . .'" (emphasis added) (quoting Yellow Pages Grp., LLC v. Ziplocal, LP, C.A. No. N13C-10-225 JRJ CCLD, 2015 WL 358279, at *4 (Del. Super. Ct. Jan. 27, 2015) (unpublished))).

E.  Kelly Waived the Argument that the APA Does Not Allow for Indemnification of Attorneys' Fees Between Parties and Affiliates

Kelly next argues that Delaware law requires an agreement to "unequivocally provide" that the indemnification of attorneys' fees applies to "first-party litigation" and the APA does not expressly provide for attorneys' fees in "first-party litigation." So, Kelly argues, he is not liable for attorneys' fees to the defendants, whom he contends are "first-parties." We need not address the merits of this argument, because Kelly has waived it.

Despite multiple hearings and rounds of briefing on the merits and on damages, Kelly did not raise this argument in the district court. He merely argued that Riverside had failed to show it had actually paid any legal fees and later that the fees alleged were unreasonable. In consequence, this argument is waived. See United States v. Nygren, 933 F.3d 76, 88 n.3 (1st Cir. 2019).

F.  Based on Kelly's Waivers, the Indemnification Claim Provides a Complete Defense to Kelly's Claims and Indemnification of Attorneys' Fees

Kelly argues that the district court erred in granting summary judgment and awarding attorneys' fees because it did not determine whether he breached his warranties before addressing the merits of the indemnification claim. We reject the argument, again for waiver reasons.

There were several, at least two, clauses on which the defendants argued Kelly was liable for indemnification. Kelly's initial brief to this court only argues about one of the possible sources of the violation and not the other. This is insufficient argument for us to conclude the district court erred in finding breach.[11]

Kelly waived any argument that the side agreement did not breach Article 2 by "be[ing] in conflict with" Section 3.23(f), because the side agreement would "increase the amount of compensation . . . due to [Kelly]." Kelly represented in Article 2 that the APA would not "be in conflict with" any other agreement and represented in Section 3.23(f) that the Transaction would not "increase the amount of compensation or benefits due to any individual." Kelly does not argue in his initial brief that the side agreement would not conflict with Section 3.23(f) and so does not accordingly breach Article 2. Kelly has waived any such argument. Pignons S.A. de Mecanique, 701 F.2d at 3.

This breach of Article 2 entitles the defendants to uncapped indemnification, which would cover all damages Kelly

---

[11]    Further, Kelly's argument in his reply brief that Article 2's "in conflict with" clause cannot apply to Article 3 representations is insufficiently developed. Zannino, 895 F.2d at 17.

could be awarded and attorneys' fees. Kelly's only arguments to the contrary are meritless[12] or waived.[13]

Kelly argues that the indemnification claim cannot accrue without a determination of breach, which is absent here because the existence of the side agreement has not been established. He contends that the district court improperly granted summary judgment against him "for _believing_ that he had an extrinsic agreement with [the defendants]." Although the indemnification claim provides a complete defense to Kelly's claims, his argument also implies that the district court could not award attorneys' fees without determining whether the side deal existed.

Kelly did not adequately present this argument to the district court, and so he has waived it. _Arrieta-Gimenez_, 859 F.2d at 1037. The defendants' counterclaim asserts that Kelly

---

[12] Kelly contends that the APA caps his indemnification liability at $1,804,585 and that his damages could exceed this cap. But a breach of Article 2 is not subject to this cap, and so his argument lacks merit.

[13] Kelly has doubly waived his argument that he has an "unclean hands" defense against indemnification, as it is not in Kelly's initial brief or sufficiently developed. _Pignons S.A. de Mecanique_, 701 F.2d at 3; _Zannino_, 895 F.2d at 17. He has also waived his argument indemnification here would be "repugnant to the public policy of Delaware," _J.S. Alberici Constr. Co._ v. _Mid-West Conveyor Co._, 750 A.2d 518, 520 (Del. 2000), because he did not argue it in his initial brief, _Pignons S.A. de Mecanique_, 701 F.2d at 3.

breached his warranties "[b]y failing to disclose his belief or intention to later assert [the existence of the side agreement]." The defendants argued to the district court that their indemnification counterclaim was a complete defense to Kelly's claims and that the APA required Kelly to pay their "attorneys' fees in defense of this case, under any outcome." They stated that if Kelly proved his claims, he would have to show the existence of the side agreement, which breaches his warranties. Even if Kelly lost on his claims, the defendants argued, he would "still owe[] indemnity because he nevertheless admit[ted] he breached the warranties in the APA by signing the APA while believing he had an alleged . . . side-deal with Riverside."

Kelly did not address this argument in his memorandum in opposition to the defendants' motion for summary judgment. Nor did Kelly clearly address this argument in other summary judgment briefings or at the summary judgment hearing.[14]

---

[14]   The defendants argue that Kelly waived the argument that the district court improperly concluded Kelly breached the agreement by holding a "<u>belief</u> that he had a side-deal." Kelly argues that he did raise this point before the district court. But the pages he cites perfunctorily argue that the defendants could not "circumvent the survival clause by phrasing their breach of warranty claim as fraud," and do not clearly address the "belief" argument. Although Kelly baldly asserts that this "belief" argument is "without merit" in his Memorandum of Law in Support of His Motion for Summary Judgment, he does not clearly or adequately address the issue.

G.    <u>The Indemnification Claim was Timely</u>

Under the plain language of the APA, claims based on breaches of Article 2 survive indefinitely.  Kelly's only arguments that the indemnification claim was time-barred rely on his earlier arguments that he did not breach Article 2 (or breach Section 3.23(f) fraudulently).   We have already determined that the indemnification claim arises out of Kelly's breach of Article 2, and so it was timely.

III.

On the bases stated, we <u>affirm</u>.